334 F.Supp. 242 (1971)
LOCAL UNION NO. 4, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Plaintiff,
v.
RADIO THIRTEEN-EIGHTY INC., a Missouri corporation, Defendant.
No. 70 C 642(3).
United States District Court, E. D. Missouri, E. D.
October 14, 1971.
*243 *244 Charles A. Werner, Schuchat, Cook & Werner, St. Louis, Mo., for plaintiff.
Vatterott, Shaffar & Dolan, St. Ann, Mo., Donald J. Meyer, Clayton, Mo., for defendant.

MEMORANDUM
WEBSTER, District Judge.
Plaintiff brings this action to compel defendant to arbitrate unresolved disputes as provided in a collective bargaining agreement alleged to exist between the parties. Jurisdiction of the court is based upon section 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185.

FACTS
Plaintiff Local 4, IBEW has about 350 members, and they operate and maintain broadcast equipment in various radio and television stations in the Metropolitan St. Louis area. Plaintiff has a collective bargaining Agreement with television stations KSD-TV, KMOX-TV, KTVI, and KPLR, and with radio stations, KSD, KMOX, WEW, KXOK, KWK, KCFM, WOKZ (Alton, Illinois), WGEM and KHQA (Quincy, Illinois). The radio and television stations transmit and broadcast both in Missouri and Illinois, with signal beams crossing state lines. Some of the transmitters are located in Missouri, and others in Illinois.
Plaintiff has represented the engineers and technicians at Radio Station KWK for collective bargaining purposes from approximately 1935 to the present time. (Prior to 1959, plaintiff was known as Local 1217, IBEW.)
Over the years, different corporations such as KWK Radio, Inc., KWK, Inc., and Thomas Patrick, Inc. have operated Radio Station KWK on federally assigned 1380 kilocycles.
The defendant, Radio Thirteen-Eighty, Inc., is a Missouri corporation with its principal office located within the Eastern District of Missouri. The defendant was incorporated on or about May 24, 1965, and the corporation is still in existence. On December 22, 1965, the Federal Communications Commission issued interim operating authority to defendant to operate Radio Station KWK; and said authority has not been revoked by the F.C.C.
Plaintiff and defendant entered into a collective bargaining Agreement for the period from April 16, 1967 to April 15, 1969 (hereafter "Agreement") covering the wages, hours, and other terms and conditions of employment for the engineers and technicians employed by defendant. A letter of Understanding, dated August 19, 1968, concerning an increase in wage rates was executed between plaintiff and defendant.
The Agreement contained the following grievance-arbitration provision in ARTICLE III Arbitration-Controversies-Disputes:

Section 3.01: The Employer and the Union agree to meet and confer with representatives of the other at reasonable times on any and all questions or matters relative to the terms and conditions of this Agreement. There shall be no stoppage of operations either by strike or lockout during the terms of this Agreement because of any dispute over matters relating to provisions herein.

Section 3.02: In the event of a dispute, difference or disagreement between the Employer and the Union concerning the interpretation or application of the terms of this Agreement, representatives of the Employer and the Union shall make an honest and sincere effort to adjust the same in an amicable manner. In the event, however, of the inability of the Employer and the Union to reach an agreement within seven (7) days on the issue or issues in dispute, the question will, at the option of either party, be submitted for arbitration in the following manner: Either party may demand arbitration and shall give five (5) days' advance notice in writing to the other party of its desire to arbitrate. The dispute shall be submitted to a Board of Arbitration consisting of three (3) members. One *245 member shall be selected by the Employer, one by the Union, and the third by the first two. In the event that the first two arbitrators cannot agree upon the selection of the third; then, within five (5) days, the third shall be appointed by the Federal Mediation and Conciliation Service. The third member, regardless of how he is selected, shall be Chairman.
While the matter is pending in arbitration, there shall be neither strike nor lock-out and the decision of a majority of the Board of Arbitration shall be binding on both parties, provided, however, that any decision from the Board of Arbitration shall not add to, detract from, or alter the terms of this Agreement in any way, nor shall the same question be the subject of arbitration more than once.
The fee and expenses, if any, of the Arbitrator selected by the Employer and of the Arbitrator selected by the Union, shall be paid by the party making the selection. The fee and expenses, if any, of the third member of the Board of Arbitration shall be shared equally by the parties and whatever other expenses are involved in the arbitration hearing shall be shared equally by the parties.

Section 3.03: Authorized representatives of the Union shall be allowed access at reasonable hours to the premises of the Employer where members of the Union are employed under this Agreement in order to inspect or investigate operations of the Employer for compliance with the terms and conditions hereof. This provision is not to be construed so as to permit investigation of the Employer's financial or confidential records.
ARTICLE XII of the Agreement contained the following language concerning modification or termination of the Agreement at its expiration date:
"THIS AGREEMENT shall become effective as of the 16th day of April, 1967, and shall remain in full force and effect through the 15th day of April, 1969, and each year thereafter, unless written notice of termination or of desired modification is given at least sixty (60) days prior to any yearly expiration date by either of the parties hereto." (Emphasis supplied.)
Prior to April 15, 1969, neither plaintiff nor defendant gave written notice to the other party with respect to terminating or amending the Agreement.
From April 15, 1969 to August 15, 1969, the defendant paid wages, fringe benefits, vacation pay and holiday pay in a manner that was in no way inconsistent with the terms of the Agreement; and during the same period the defendant complied with the non-economic items in the Agreement, such as manning, seniority, in a manner that was in no way inconsistent with the terms of the Agreement.
On February 26, 1966, the transmitter and studio of Radio Station KWK which was located at 400 Conduit Road in North St. Louis, Missouri, were moved about 1,000 feet to 500 Terminal Row, where they have remained, using the same call letters and wave length. On January 1, 1971, while the transmitter plant was still located at 500 Terminal Row, Radio Station KWK was transmitting from a place in or about Granite City, Illinois.
Engineers William Bivens, Rudolph Isenberg, Roy Knapp, John Mitchell and George Vaughn, started working for defendant on February 26, 1966, and continued working until August 15, 1969.
Prior to August 15, 1969, Byron Bellville, who succeeded Don Hamel as General Manager of Radio Station KWK, was himself succeeded by Dr. Robert Bass, who was the General Manager of Radio Station KWK on August 15, 1969.
On August 15, 1969 at about 4:30 P.M. Clifton Gates, President and Treasurer of defendant, handed Engineer George Vaughn a statement to read over the air. The statement announced that Radio Station KWK was temporarily leaving the air. Radio Station KWK went off the air and did not broadcast *246 from 5:00 P.M. on August 15, 1969 until approximately 5:15 A.M. on August 24, 1969. Defendant informed the engineers that their services were no longer required.
The staff engineers and part-time engineers working at Radio Station KWK on August 15, 1969, including one engineer on vacation, were William Bivens, Rudolph Isenberg, Roy Knapp, John Mitchell, Samuel Reed, George Simpson, George Vaughn, Thomas Vogt, and Paul Wagner. None of these engineers worked at Radio Station KWK after August 15, 1969, and none of the engineers were asked by Radio Station KWK to return to work. All of the engineers were members of plaintiff Local 4, IBEW.
Radio Station KWK resumed broadcasting on August 24, 1969, and has thereafter continued to broadcast on a daily basis. None of the engineers working for Radio Station KWK on August 15, 1969 were recalled to work by defendant; instead, defendant employed other engineers to operate Radio Station KWK.
On August 15, 1969, Vaughn told Merril Davis, Business Manager of plaintiff, that Radio Station KWK was going off the air. Davis spoke to Clifton Gates who confirmed that the Station was going off the air. Davis told Gates that there had been no notice to the engineers or plaintiff. Davis told Gates that it "Looks to me like we've got some serious problems"; to which Gates replied, "Well, we may have". Davis asked Gates when he could sit down and discuss these problems with him, and Gates replied, "Call me". Gates did not testify at the trial.
Davis testified that he tried to reach Gates by telephone on numerous occasions over the weekend of August 15th-17th, 1969, but while he was able to contact his office, he was never able to talk to Gates. Davis also tried to contact Glennon Vatterott, Vice-President and Secretary of defendant, and Dr. Robert Bass, General Manager of defendant, but was not able to reach either man.
On August 18, 1969, Davis sent a letter to Dr. Bass at Radio Station KWK asking to discuss the layoff of the engineers. Davis did not receive a reply to his letter. On August 25, 1969, Davis sent a second letter to Dr. Bass at Radio Station KWK demanding reinstatement of the engineers. No reply was received. On September 2, 1969, Davis sent a third letter to Dr. Bass demanding arbitration. Plaintiff's demand for arbitration was ignored by defendant and no arbitration proceeding has taken place.
In 1969 several applicants, including defendant, were vigorously competing for the right to operate Radio Station KWK. One of these was Karin Broadcasting Company. Sometime after August 15, 1969, Davis introduced to the St. Louis Labor Council a representative of Karin who wanted to talk to the Executive Board about taking over Karin or applying for a construction permit to operate KWK. This occurrence, although only thinly developed at the trial, is mentioned here because defendant advances it as a defense to plaintiff's claim.
On June 19, 1969, the F.C.C. issued its order[1] approving a Settlement Agreement among the eight applicants, defendant and Vic-Way Broadcasting Company, and granting a construction permit to Vic-Way Broadcasting Company. Paragraph 5 of the Settlement Agreement provides in part as follows:
"Following the Closing date, which shall be the date set forth in Paragraph 3(a), `RTEI' [defendant] agrees to continue operating the station [Radio Station KWK] until such time as `Vic-Way' calls upon it to cease operations, losses, if any, to be underwritten by `Vic-Way' during such period."
*247 The "closing date" was July 26, 1969. On December 10, 1970, effective December 11, 1970, Vic-Way Broadcasting Company called upon defendant to temporarily cease operating Radio Station KWK from the transmitter on the St. Louis side of the Mississippi River so that Vic-Way could operate the transmitter on the Illinois side.
Wendell Cox, President and Treasurer of Vic-Way Broadcasting Company, testified that as of July 26, 1969 Radio Station KWK was a "sweet music station"; a "white radio station". He said that the Ford Foundation had loaned Vic-Way Broadcasting Company $500,000 to purchase the stock of the stockholders of defendant, "provided that station had for black people total relevancy, social significance, and financial responsibility". Cox testified that after July 26, 1969, the programming of the defendant was revamped so that Radio Station KWK would be a black radio station and a "combo" operation. He stated that the engineers were terminated on August 15, 1969, and that new engineers were hired when Radio Station KWK went back on the air. The check given to engineer George Vaughn as his final pay check was drawn on defendant's payroll account.
As of July 1, 1969, defendant had eight (8) shareholders, each shareholder holding five (5) shares of stock. On August 15, 1969, there were only two (2) shareholdersVictory Broadcasting Company, Inc. and Archway Broadcasting Company and each held five (5) shares of stock. The shareholders of defendant and the number of shares held have remained the same from August 15, 1969 to the present time. From August 1, 1969 to the present time, Clifton Gates has been the President and Treasurer of defendant, and Glennon Vatterott has been the Vice-President and Secretary of defendant, and both are the only Directors of defendant.
Vic-Way Broadcasting Company, is a Missouri Corporation, whose officers as of January 1, 1969, included Glennon Vatterott, Secretary Clifton Gates, Vice-Chairman, and Robert Bass, Executive Vice-President. Archway Broadcasting Company is a Missouri Corporation, whose officers as of January 1, 1969 to the present time included Glennon Vatterott, Secretary-Treasurer. Victory Broadcasting Company is a Missouri Corporation whose officers from January 1, 1969 to the present time included Robert Bass, Chairman of the Board, and C. W. Gates, President. (Bass is also General Manager of defendant). As of January 1, 1970 and January 1, 1971, Victory Broadcasting Company held 75% and Archway Broadcasting Company held 25% of the outstanding shares of stock of Vic-Way Broadcasting Company.
On September 17, 1969, plaintiff filed an unfair labor practice charge against defendant with the National Labor Relations Board with respect to the discharge of the engineers, which was dismissed November 25, 1970. An appeal to the Office of Appeals, N.L.R.B. was denied March 18, 1971 in Case No. 14-CA-5286 by letter stating as follows:
"Your appeal in the above matter has been duly considered. The appeal is denied. Under all of the circumstances, there was insufficient evidence to establish that the Employer [defendant] had violated the Act [Labor Management Relations Act], as alleged."

CONCLUSIONS OF LAW

I

Existence of the Contract on August 15, 1969
It is the contention of plaintiff that the collective bargaining agreement was in effect at the time of the lockout or discharge on August 15, 1969, and that under its provisions, defendant is bound to submit the dismissal of the engineers on that date to arbitration. Defendant maintains that the agreement was not in effect on August 15, and presents several arguments in support of this position.
*248 Section 11.12 of the contract entered into between plaintiff and defendant on April 16, 1967 contains the following provisions:
"It is agreed that if at any time during the term of this agreement the Federal Communications Commission awards the present frequency of KWK (1380 kc.) to any one of the present interim operators, that such operator may assume all of the terms and conditions of this agreement from the time of such award."
Defendant argues that this language evidences the intent of the parties to terminate the contract when the F.C.C. permanently awarded the frequency to one of the interim operators. It is defendant's position that the F.C.C.'s June 18, 1969 action granting Vic-Way Broadcasting Company a construction permit and approving the settlement agreement dismissing the other applications for authority to operate KWK constituted an award of the frequency of 1380 kc. to one of the interim operators within the meaning of the contract. Thus defendant maintains that the collective bargaining agreement became inoperative by its own terms.
The award of a construction permit to Vic-Way was not an award of the frequency within the intended meaning of section 11.12 of the contract. Only defendant possessed F.C.C. authorization to operate station KWK at all times material to this suit. The evidence indicated that as of October 9, 1969, Vic-Way had not even applied for a license to operate 1380 kc. in St. Louis.
Defendant maintains that even if the conditions of section 11.12 were not satisfied, plaintiff understood the contract to have been terminated, citing plaintiff's failure to question the terms of the Settlement Agreement approved by the F.C.C. purporting to limit Vic-Way's assumption of defendant's liability to plaintiff to termination pay and accrued vacation pay. Defendant contends this shows plaintiff's acceptance of defendant's position that defendant was no longer obligated to pay wages under the collective bargaining agreement. In making this argument, defendant misquotes the settlement agreement, which actually limited Vic-Way's undertaking to "termination pay, accrued vacation pay or other present liabilities of RTEI." (Emphasis supplied.) In any event, this defense is likewise without merit.
Defendant maintains that plaintiff supported Karin Broadcasting Company before the Executive Board of the St. Louis Labor Council in Karin's opposition to Vic-Way's application for a construction permit and defendant's interim authority to broadcast over 1380 kc., in proceedings before the F.C.C. It is defendant's position that plaintiff would not have supported the cause of one of defendant's competitors if it still believed the collective bargaining agreement to be in effect. This contention is without merit. Evidence at trial only established that Merril Davis, plaintiff's business manager, introduced Charles Rand, a representative of Karin, to the Executive Board of the St. Louis Labor Council, at Rand's request. There is no evidence that plaintiff was in any way involved in Karin's attempt to participate in the F.C.C. proceedings. Plaintiff's activities in this regard do not support the conclusion that it considered the collective bargaining agreement to have terminated.
Change in defendant's nature affecting automatic renewal clause. When the parties entered into the collective bargaining agreement on April 16, 1967, defendant's stock was held by eight corporate applicants for permanent authorization to broadcast over 1380 kc. Prior to the August 15, 1969 lockout, Victory Broadcasting Company and Archway Broadcasting Company had become defendant's only shareholders, and Vic-Way had obtained a construction permit with a view towards moving the transmitting facilities of KWK to Cabaret Island near Granite City, Illinois. Defendant maintains that although its corporate entity still existed on August 15, 1969, its "nature" had been so drastically *249 changed as to render the automatic renewal clause of the collective bargaining agreement ineffective.
Defendant cites Bath Marine Draftsmen's Association v. Bath Iron Works Corporation, 266 F.Supp. 710 (D. Me.1967), modified 393 F.2d 407 (1st Cir. 1968) and Fraser v. Magic Chef-Food Giant Markets, Inc., 324 F.2d 853 (6th Cir. 1963) for the proposition that circumstances surrounding a corporation's existence may change so drastically as to excuse its obligations under employment contracts. In Bath, the First Circuit Court of Appeals held that upon merger of a wholly owned subsidiary into its parent, former employees of the subsidiary, who had been paid lower wages than the parent's employees prior to the merger, would be permitted to avoid their collective bargaining agreement with the subsidiary and submit their claims for higher wages to arbitration. Fraser was an action by dismissed employees to recover wages alleged due after an employer closed its plant prior to the expiration date of the employment contract. The Sixth Circuit held that ceasing operation of the plant did not violate the employment contract and therefore denied recovery. Neither of these cases is apposite. Here defendant retained its corporate structure and continued its operations over 1380 kc. A mere change in the number of its shareholders would not dissolve defendant's liability under its contracts, or in this case affect the applicability of the automatic renewal clause. Likewise, the change in programming policy is completely irrelevant.

II

Effect of N. L. R. B. Proceeding
Defendant maintains that even if the collective bargaining agreement was in force on August 15, 1969, plaintiff is precluded from bringing the present action because it has already sought resolution of the dispute by submitting its contentions to the National Labor Relations Board, and because it failed to follow the procedures outlined in the contract for submitting disputes to arbitration.
Prior submission to the N. L. R. B. Defendant contends that the N. L. R. B.'s refusal to issue a complaint upon plaintiff's unfair labor practice charge renders the controversy in this case res judicata. Failure of the N. L. R. B. to issue an unfair labor complaint does not render the merits of a dispute res judicata, precluding subsequent court action under the Labor Management Relations Act. Aircraft & Engine Maintenance & Overhaul, Building, Construction, Manufacturing, Processing and Distribution and Allied Industries Employees, Local 290, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Oolite Concrete Company, 341 F.2d 210 (5th Cir. 1965), cert. denied, 382 U.S. 972, 86 S.Ct. 529, 15 L.Ed.2d 465 (1966); Thomas v. Consolidation Coal Company (Pocahontas Fuel Company Division), 380 F.2d 69 (4th Cir. 1967); Taube Electrical Contractors, Inc. v. International Brotherhood of Electrical Workers, Local Union No. 349, AFL-CIO, 261 F.Supp. 664 (S. D.Fla.1966); 2 Davis, Administrative Law Treatise §§ 18.03 and 18.06.
Defendant next urges that even if the dispute is not res judicata, section 3.02 of the collective bargaining agreement operates to prevent plaintiff from compelling arbitration after prior submission of an issue to the N. L. R. B. That section provides that no dispute between the parties shall "be the subject of arbitration more than once." Defendant maintains that this language manifests the agreement of the parties to choose among possible forums and to submit a dispute for decision only once.
Section 3.02 outlines the procedure by which three members of a "Board of Arbitration" are to be selected and disagreements submitted to them. It would appear that the parties were referring to this procedure when they agreed not to submit matters to "arbitration" more than once. However, the *250 court does not render a decision on this point, as it finds this contention to be a matter of contract interpretation, a proper matter for the arbitration.
Procedure. In its answer, defendant alleges that plaintiff has failed to follow the procedures for submitting matters to arbitration outlined in section 3.02. There is evidence to the contrary, but the court does not find it necessary to decide this issue. Once it has been determined that parties are obligated to submit a dispute to arbitration, procedural questions which grow out of the dispute and bear on its final disposition are matters for the arbitrator to decide. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Local 198 United Rubber, Cork, Linoleum & Plastic Workers of America, AFL-CIO v. Interco, Inc., 415 F.2d 1208, 1210 (8th Cir. 1969); Bevington & Basile Wholesalers, Inc. v. Local Union No. 46 of the International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL-CIO, 330 F. 2d 202, 204 (8th Cir. 1964). Even if defendant's contentions that plaintiff has not met the procedural requirements for submitting matters to arbitration are meritorious, this court is not precluded from entering an order compelling defendant to arbitrate.

III

Duty to Arbitrate
Section 3.01 of the collective bargaining agreement provides:
"There shall be no stoppage of operations either by strike or lockout during the terms of this Agreement because of any dispute over matters relating to the provisions herein."
Section 3.02 of the contract provides that any "dispute, difference or disagreement between the Employer and the Union concerning the interpretation or application of the terms of this Agreement" may be submitted to arbitration in the event the parties fail to find an amicable solution. The present dispute involves the propriety of the dismissal of seven engineers on August 15, 1969. The court finds that under the contract it is proper to submit the dispute to arbitration. Where a collective bargaining agreement provides that disputes over any matters covered by the contract are to be submitted to arbitration, an action to compel an employer to arbitrate such a dispute may properly be brought under section 301 of the Labor Management Relations Act. United Steelworkers of America v. Warrior Gulf & Navigation Co., 363 U.S. 574 (1960); Local 198, United Rubber, Cork, Linoleum & Plastic Workers of America, AFL-CIO v. Interco, Inc., 289 F.Supp. 215 (E.D.Mo.1968), aff'd 415 F.2d 1208 (8th Cir. 1969); United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed. 2d 1403 (1960); United Brick & Clay Workers of America v. A. P. Green Fire Brick Company, 343 F.2d 590 (8th Cir. 1965).

IV

Conclusion
The court finds and concludes, by virtue of the automatic renewal clause, by failure of either plaintiff or defendant to terminate the contract and by failure of the contract to terminate under its own terms, that the collective bargaining agreement between plaintiff and defendant was in effect on August 15, 1969; that defendant's conduct in dismissing the seven engineers is a proper subject for arbitration under the agreement; and that this court has jurisdiction under section 301 of the Labor Management Relations Act to order the parties to arbitrate in accordance with the procedures set forth in the Agreement, and should do so.
Accordingly, a judgment and decree will be entered directing defendant to submit the dispute to arbitration.
The request for allowance of attorneys' fees will be denied.
NOTES
[1] In the Application of Great River Broadcasting, Inc., et al., Case No. F.C.C. 674, 18 F.C.C.2d 212, affirmed sub nom. Karin Broadcasting, Inc. v. F.C.C., (D.C.Cir. Case No. 23608).