LOCAL UNION NO. 4, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Appellee,

v.

RADIO THIRTEEN-EIGHTY, INC., a Missouri Corporation, Appellant.

LOCAL UNION NO. 4, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, Appellant,

v.

RADIO THIRTEEN-EIGHTY, INC., a Missouri Corporation, Appellee.

Nos. 71-1706, 71-1677.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1972.

Decided Nov. 29, 1972.

Donald J. Meyer, Clayton, Mo., for Local Union No. 4 and others.

Charles A. Werner, St. Louis, Mo., for Radio Thirteen-Eighty, Inc.

Before BRIGHT and STEPHENSON, Circuit Judges, and TALBOT SMITH* District Judge.

BRIGHT, Circuit Judge.

The Union, Local 4, International Brotherhood of Electrical Workers, AFL–CIO, brought this action under § 301 of the Labor Management Relations Act as amended, 29 U.S.C. § 185,[1] to require Radio Thirteen-Eighty, Inc. (Radio, Inc.) to arbitrate its asserted right to terminate the employment of engineers represented by the Union. Radio, Inc. had dismissed the engineers, and then declined, despite the Union's demands to reinstate them or arbitrate their status. The district court found the termination of the engineers by Radio, Inc. to be a proper subject of arbitration under a collective bargaining agreement in existence at the time of the dismissals. The court ordered the parties to arbitrate the dispute in accordance with procedures set forth in that agreement. Local 4, IBEW v. Radio Thirteen-Eighty, Inc., 334 F.Supp. 242 (E.D.Mo.1971). Radio, Inc. brought this timely appeal, and the Union cross-appealed, contending that the court had erred in declining to award attorney's fees upon successful prosecution of the suit.

Radio, Inc. commenced operating Radio Station KWK in 1965 under interim authority granted by the Federal Communications Commission to broadcast at 1380 kc. out of St. Louis, Missouri. During the interim operation of the station, eight local broadcasting companies equally shared ownership of Radio, Inc.

---

* Eastern District of Michigan, sitting by designation

1. 29 U.S.C. § 185(a) reads:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

and controlled its operation through representation on its Board of Directors. These companies, through competitive applications to the FCC, each sought sole and permanent authority to broadcast on the frequency.

In December of 1968, these contenders for the frequency and Radio, Inc. entered into a Settlement Agreement providing that one of them, Victory Broadcasting Co., Inc., would continue actively to seek the frequency while the others, for valuable consideration, would withdraw from the contest. This agreement was presented to and received the approval of the FCC on June 18, 1969. In its order of that date, the Commission authorized Victory Broadcasting Co., under an amended application, to merge with another of the applicants, Archway Broadcasting Co., to form a new corporate entity called Vic-Way Broadcasting Co. (Vic-Way). The order directed Vic-Way to carry out the terms of the Settlement Agreement by reimbursing the withdrawing applicants for their expenses and capital contributions incurred during the interim operation of Station KWK. It further provided, pursuant to the terms of the agreement, for Radio, Inc.'s continued responsibility for the functioning of the Station until called upon by Vic-Way to cease operations. Any losses were to be underwritten by Vic-Way. Although the agreement of the parties contemplated that Vic-Way eventually would obtain broadcast authority over frequency 1380 kc., on the date of the engineers' dismissal, August 15, 1972, the orders of the Commission had proceeded only to the point of authorizing Vic-Way to construct new broadcast station facilities near Granite City, Illinois. These orders had not affected the existing authority of Radio, Inc. to continue operating Station KWK on frequency 1380 kc.

The record shows that Vic-Way had obtained substantial financing for its purchase of the capital stock of Radio, Inc., through a loan from the Ford Foundation, on representations that Vic-Way would provide new programming particularly appealing and relevant to black people. By July 26, 1969, financing and other arrangements had been cleared sufficiently by Vic-Way to enable it to satisfy its financial obligations under the Settlement Agreement, and it then acquired the capital stock of Radio, Inc.

On August 15, 1969, Station KWK temporarily went off the air. It resumed broadcasting on a regular basis on August 24, 1969, but, in the meantime, had obtained new engineering personnel to operate the Station. The former engineers, represented by the Union, were advised that the Station no longer needed their services. Following this discharge, as we have noted, Radio, Inc. disregarded the Union's requests for reinstatement of the engineers, or in the alternative, for arbitration of their dismissal.

A collective bargaining agreement between the Union and Radio, Inc., covering wages, hours, and working conditions, had been entered into on April 16, 1967. It was to be effective for a period of two years from that date, and thereafter, automatically renewed on a year-to-year basis, unless either party gave notice of termination or modification not less than sixty days prior to the expiration of a given contract year. The parties concede that no such notice of termination or modification was given in this case.

The bargaining agreement barred strikes or lockouts [2] and provided, in § 302, for arbitration of disputes by a

---

2. Section 301 of the agreement read:
 The Employer and the Union agree to meet and confer with representatives of the other at reasonable times on any and all questions or matters relative to the terms and conditions of this Agreement. There shall be no stoppage of operations either by strike or lockout during the terms of this Agreement because of any dispute over matters relating to provisions herein.

*Board of Arbitration*[3] *according to the following terms:*

> In the event of a dispute, difference or disagreement between the Employer and the Union concerning the interpretation or application of the terms of this Agreement, representatives of the Employer and the Union shall make an honest and sincere effort to adjust the same in an amicable manner. In the event, however, of the inability of the Employer and the Union to reach an agreement within seven (7) days on the issue or issues in dispute, the question will, at the option of either party, be submitted for arbitration * * *.

Section 11.12 of the bargaining agreement afforded recognition to the interim status of the broadcast license held by Radio, Inc., providing:

> It is agreed that if at any time during the term of this agreement, the Federal Communication [Commission] awards the present frequency of KWK (1380 kc.) to any one of the present interim operators, that such operator may assume all of the terms and conditions of this Agreement from the time of such award. It is further agreed that if at any time during the term of this contract the Federal Communications Commission should order Radio Thirteen-Eighty, Inc., to permanently sign KWK (1380 kc.) off the air, that Radio Thirteen-Eighty, Inc., shall be required to pay Technicians for any vacation earned but not taken, severance pay, and any other compensation due.

The Union initially sought relief against the alleged lockout of its member engineers by filing with the NLRB unfair labor practice charges against Radio, Inc. The Board declined to proceed. The Union, thereafter, successfully brought this action in federal court for injunctive relief.

At trial and on this appeal, Radio, Inc. has focused on the provisions of § 11.12 of the collective bargaining agreement, arguing that "Implicit in this contract language is the intent that the collective bargaining agreement would terminate when, as the contract states, the FCC '. . . awards the present frequency of KWK (1380 kc) . . . .'" Radio, Inc. recognizes that this position conflicts with express language to the contrary in the automatic renewal provision of the bargaining agreement but urges that, with the application of "reason and judgment" in light of all the circumstances, the agreement must be deemed to have terminated on or before August 15, 1969, and therefore that the arbitration provisions therein have no application.

In rejecting this contention, the district court determined that the FCC had not at any time material to this suit made an "award of the frequency within the intended meaning of section 11.12 of the contract." Radio Thirteen-Eighty, Inc., supra, 334 F.Supp. at 248. It concluded that the contract was in effect on August 15, 1969, and directed that the parties arbitrate the propriety of the dismissal of the engineers by Radio, Inc. Although we agree that the controversy between Radio, Inc. and the Union was arbitrable, we need not, and should not, construe the effect of the language of § 11.12.

 The basic principles governing this case are well established. Congress and the Supreme Court have expressed a clear preference for contractual grievance procedures as a means of settling labor disputes.[4] John Wiley & Sons,

---

3. The Board was to consist of an arbitrator selected by each party and a neutral member selected by the other two arbitrators.

4. The Court has given this description of the importance of arbitration in the field of labor-management relations:

> * * * [T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution

Inc. v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 566, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Mesker Bros. Industries, Inc., 457 F.2d 91, 95 (8th Cir. 1972). Where an exclusion-from-arbitration clause is vague, and the arbitration clause quite broad, only the most forceful evidence of a purpose to exclude the claim from arbitration will deter a court from directing the dispute to arbitration. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 581, 584–585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Local 198, United Rubber Workers v. Interco, Inc., 415 F.2d 1208, 1211 (8th Cir. 1969). See John Wiley & Sons, Inc., supra, 376 U.S. at 553–555, 84 S.Ct. 909; American Manufacturing Co., supra, 363 U.S. at 567, 80 S.Ct. 1343. Where the contract is not susceptible to a construction that the parties had agreed to arbitrate the dispute in question, arbitration will not be ordered. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241 (1962); Warrior & Gulf Nav. Co., supra, 363 U.S. at 582, 80 S.Ct. 1347. Under § 301 of the Labor Management Relations Act, the courts are assigned the duty of determining, in a given case, whether the parties have agreed to arbitrate and whether the reluctant party has breached that agreement. Warrior & Gulf Nav. Co. at 582, 80 S.Ct. 1347, 4 L. Ed.2d 1409.

■ Applying these principles to the facts presented in this case, we conclude that the construction and interpretation of § 11.12 falls within the scope of the arbitration clause adopted by the parties. The ambit of the bargaining agreement's procedures is painted broadly, requiring arbitration "In the event of a dispute, difference or disagreement * * * concerning the *interpretation* or *application* of the terms of this Agreement * * *." (Emphasis added). Radio, Inc. concedes that this language of the agreement compels arbitration of its claimed right to discharge the engineers on its payroll as of August 15, 1969, if the agreement was then in force. We believe the arbitration clause to be sufficiently broad to encompass the latter question as well, cast in terms of § 11.12's application to or impact upon the duration of the agreement as a whole. The "awards the present frequency" language in § 11.12 of the agreement somewhat vaguely and ambiguously implies an intended termination of the agreement. Thus, the Board of Arbitration, under its broad delegation of authority, is the appropriate forum for resolving the ambiguity of § 11.12, not only regarding the interpretation of specific terms within the section, but also with regard to whether that section shortened the duration of the agreement.

In *Local 198, United Rubber Workers, supra*, 415 F.2d at 1211, a case involving employee termination resulting from the closing of a plant, we noted that the existence of at least "an arguable question" of contractual interpretation is sufficient to compel arbitration of a dispute between company and union. Recently, we have indicated that the task of construing both express and implied terms of labor contracts properly falls within the province of the arbitrator in agreements containing broad arbitration

in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement. [United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).]

clauses. *See* Hanna Mining Co. v. United Steelworkers of America, 464 F.2d 565 (8th Cir., 1972) ; Northwest Airlines, Inc. v. Air Line Pilots Association International, 442 F.2d 251, 254 (8th Cir. 1971) ; Northwest Airlines, Inc. v. International Association of Machinists and Aerospace Workers, 442 F.2d 244 (8th Cir.1970).

In *Air Line Pilots* we said :

\* \* \* [W]e feel that it is important that parties to collective bargaining agreements submit disputes, arguably arising out of such agreements, to arbitration. This holding is grounded in the conviction that labor disputes ought to be kept out of the courts whenever possible, that arbiters are usually qualified by experience and training to decide such disputes, \* \* \* that the informality of arbitration proceedings and the leadership of the arbiter is conducive to the settlement not only of the precise dispute being arbitrated but of other differences which may be festering in the relationship between the parties, and that an arbiter is in a position to act more expeditiously, if he will, than is a court. [442 F.2d at 254.]

We echo that holding here in requiring that the parties arbitrate the issue of whether § 11.12 of the collective bargaining agreement terminates that agreement as well as other issues between the parties which would follow should this threshold question be answered negatively.

Radio, Inc. has cited Local 998, UAW v. B. & T. Metals Co., 315 F.2d 432 (6th Cir. 1963), and Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co., 312 F.2d 181 (2d Cir. 1962), in support of the contention that the issue of termination of a labor contract rests with the courts. We decline to follow these cases. In each of them the employer-conduct sought to be arbitrated fell outside the express expiration date of the contract. More significantly, in Local 998 UAW v. B. & T. Metals Co., *supra,* the case most nearly on point, the specific arbitration clause was not as broad as the one in the instant case. Finally, the position taken in these cases, resolving the construction of ambiguous terms in bargaining agreements in favor of nonarbitration, is at variance with the approach in cases decided by this court.

On remand, all issues and defenses tendered by the Union and Radio, Inc., including the interpretation of § 11.12 as it relates to the duration of the collective bargaining agreement, should be considered de novo by the arbitrators and free from the constraint of determinations of the district court.

■ In its cross-appeal, the Union asserts that our opinion in United Steelworkers of America v. Butler Manufacturing Co., 439 F.2d 1110, 1112–1113 (8th Cir. 1971) demonstrates that the trial court erred in declining an award of attorney's fees to the successful party. In this case, however, we do not necessarily perceive bad faith by the employer. The question of awarding attorney's fees generally falls within the discretion of the trial court. We do not believe that it abused its discretion in denying fees in this case.

The judgment of the district court should be modified to instruct the parties to proceed to arbitration as provided in this opinion. Otherwise, the judgment is affirmed.