**GALLO WINE SALES OF NEW JERSEY, INC., Plaintiff,**

v.

**WHOLESALE WINE SALESMEN'S UNION, LOCAL 18, Distillery, Rectifying, Wine and Allied Workers International Union of America, AFL–CIO, Defendant.**

No. 80 Civ. 3184 (GLG).

United States District Court, S. D. New York.

April 23, 1981.

**786**

Seyfarth, Shaw, Fairweather & Gerald-son, New York City, for plaintiff by Fredric H. Fischer, Kathleen M. McKenna, New York City, Joel H. Kaplan, Chicago, Ill., of counsel.

O'Dwyer & Bernstien, New York City, for defendant by Brian O'Dwyer, Joseph Licata, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

This labor dispute has come to this Court on a motion to enjoin arbitration and a cross motion to compel arbitration.

*THE FACTS*

On June 1, 1975, the plaintiff ("Company") entered into a collective bargaining agreement ("1975 Agreement") with the defendant ("Union"), which, by its terms, was to expire on May 31, 1978. The 1975 Agreement included an "Earning Guarantee" clause, which provided that the "salesmen shall always receive a commission on any sale made or effected by the Employer in any manner or form, either directly or indirectly." 1975 Agreement, Art. VI(B). The 1975 Agreement provided for arbitration as follows:

> Article XVI (A) Except as otherwise provided herein, in the event any dispute, difference, disagreement, grievance or controversy of any nature or character shall arise between the Employer and the Union, the parties agree that before any strike on the part of the Union or any lockout on the part of the Employer, such dispute shall be submitted to arbitration to the New York State Board of Mediation, pursuant to its rules. The decision of the arbitrator shall be final and binding on all the parties to the arbitration. The failure on the part of the Employer to agree to submit such dispute with the Union to arbitration or abide by the result of any such arbitration shall be deemed a breach of contract.

> (B) Violations by the Employer of Article[s] ... VI ... shall constitute a breach of this agreement and an unfair labor practice, notwithstanding anything contained in Article XVI (A) or any other provision of this agreement. Any such violation shall entitle the Union to apply for, without notice, and obtain, without opposition, an injunction or other order restraining such breach and/or repetitions thereof from a court of competent jurisdiction, and in addition, the Union may resort to any other economic action

free of any restriction or condition that may be imposed by any provision of this agreement, and without the necessity of first resorting to arbitration.

Article XXVI provided for negotiation for renewal of the 1975 Agreement.[1]

On March 14, 1978, pursuant to section 8(d) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 158(d), the Union sent timely notice to the Company of its intention not to renew or extend the 1975 Agreement and to negotiate a new agreement. On March 22, 1978, the Company acknowledged the Union's notice and expressed its similar intent. From April 1978 through September 1978, the parties negotiated for a new collective bargaining agreement, the central issue of which was the sales commission rate.

On September 25, 1978, the Union filed charges with the National Labor Relations Board ("Board"), charging the Company with the commission of an unfair labor practice for its refusal to bargain collectively with the Union with respect to, and for unilaterally changing, a term and condition of employment. On November 30, 1978, the Board issued a complaint, and on May 25, 1979, after nine days of hearings before Administrative Law Judge ("ALJ") Julius Cohn, the parties entered into a Settlement Agreement, which provided in part:

> 2. The parties recognize that settlement of this matter will create an interim period of time from the date of settlement to the date when the parties conclude bargaining with the execution of a collective bargaining agreement or reaching of impasse. Recognizing the existence of this interim period, and in light of the necessity to provide a compensation rate for the employees, compensation shall be calculated as follows .... The parties further recognize that the above compensation rates are not intended to

---

1. Article XXVI provided:

   Negotiations for the renewal of this agreement shall commence at least 60 days prior to its expiration date. In the event that negotiations continue beyond the expiration term of this agreement, the Employer and the Union agree that this contract shall continue in

full force and effect during the period of negotiations and the Union agrees that during the continuance of the negotiations there shall be no strike called except as provided in Article XVI (B) of this agreement, and the Employer agrees that during the period of negotiations there shall be no lockout.

constitute contract terms or to reflect the parties' positions at collective bargaining negotiations and are meant for this interim period only.

3. The terms and conditions of employment currently in effect shall continue during said interim period, provided, however, that the "Earning Guarantee" shall be discontinued and terminated upon entering of this settlement.

Pursuant to the Settlement Agreement, the Company paid back-pay from October 1, 1978 through July 27, 1979 at 6¼%, the rate provided in the 1975 Agreement, and from July 27 onward at the rate dictated by the Settlement Agreement. On October 11, 1979, ALJ Cohn closed the hearing, and on October 31, 1979, the matter was officially closed by Arthur Eisenberg, Regional Director of the Board.

Negotiations for a new contract had resumed on May 25, 1979. Although no early agreement was reached and the Union struck on November 5, 1979, the Company continued to sell and deliver wine. On November 28, the parties entered into a new collective bargaining agreement ("1979 Agreement"), which excluded the "Earning Guarantee" clause and included a new arbitration procedure. Article V of the 1979 Agreement provides:

The parties agree that all disputes, grievances, issues or conflicts that may arise regarding the application or interpretation of any of the provisions of this Ageement [sic] shall, if they cannot be settled between the parties, be submitted to arbitration in the manner provided for under Article IV, section 4:02 above. The arbitrator shall not have the right, however, to change, modify, add to or subtract from any of the terms or provisions of this Agreement.

Article IV, section 4:02 provides in part:

In the event that any grievance is not settled between the parties pursuant to the grievance procedure set forth above and as hereinafter referred to, the Union or the Employer may submit the dispute to arbitration by the Federal Mediation and Conciliation Service under its rules then pertaining. . . .

In addition, the covering Memorandum of Agreement attached to the 1979 Agreement provided:

(1) The parties have each had full opportunity to make proposals and counter-proposals during the negotiations leading to this Agreement and this Agreement is in full settlement of any and all outstanding issues between the parties and replaces any previously existing contract or terms and conditions of employmennt [sic].

On February 21, 1980, the Union requested arbitration by the New York State Board of Mediation of a dispute "regarding commissions of the salesmen from May 1979 through November 1979." The Union withdrew the request on March 12 and resubmitted it on May 15. On June 5, 1980, this Court issued an order to show cause for a preliminary injunction with a temporary restraining order preventing the Union from proceeding with or further requesting arbitration concerning the payment of sales commissions for May 1979 through November 1979. Finally, on September 26, 1980, the Union filed a cross motion for an order staying the Company's action for injunctive relief and compelling arbitration, pursuant to § 301 of the LMRA, 29 U.S.C. § 185, and oral argument was heard on November 7.

*THE ISSUES*

The issues to be decided are: (1) whether either the 1975 Agreement was still in existence when the dispute arose or the obligation to arbitrate survived expiration of the 1975 Agreement; (2) whether the alleged dispute over the payment of sales commissions is arbitrable under the 1975 Agreement; (3) whether the obligation to arbitrate, if any, was vitiated by the Settlement Agreement, the strike, or the 1979 Agreement. Intertwined with, although not determinative of, these issues, is the issue of whether the dispute over the termination of the 1975 Agreement is itself arbitrable under the 1975 Agreement.

*THE ARGUMENTS*

The Company argues that even if the 1975 Agreement had not expired before the

alleged dispute arose over the sales commission rates, Article XVI(B) of the 1975 Agreement expressly excluded this dispute from the obligation to arbitrate; that the dispute "arose under" the Settlement Agreement; and that even if the Company had been obligated to arbitrate the dispute, the obligation was vitiated by the Settlement Agreement, the strike, the 1979 Agreement, and laches.

The Union asserts that the disputes over the expiration of the 1975 Agreement and the payment of commission rates are arbitrable because they arose under the 1975 Agreement and that the Union did not waive its right to arbitrate the dispute by striking, by endorsing the Settlement Agreement, or by entering the 1979 Agreement.

*DISCUSSION*

■ The obligation to arbitrate a dispute cannot arise solely by operation of law. *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974). Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). The question of "whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962); *see Proctor & Gamble Independent Union v. Proctor & Gamble Manufacturing Co.*, 312 F.2d 181, 184 (2d Cir. 1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963).

■ If the agreement between the parties is to submit "all grievances" to arbitration, the courts are without authority to weigh the merits of the dispute. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346–1347, 4 L.Ed.2d 1409 (1960). Judicial inquiry is therefore limited to determining whether there is a collective bargaining agreement between the parties, and whether the alleged dispute falls within the agreement's arbitration provision. *Id.; see United Steelworkers of America v. Warrior & Gulf Navigation Co., supra.*

■ Once it has been determined that a collective bargaining agreement between the parties exists and contains an arbitration provision, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 582–83, 80 S.Ct. at 1352–1353. As Judge Weinfeld stated, "when the parties have entered into a comprehensive arbitration provision, any challenge that a grievance is not intended to be covered thereunder must find support in unmistakeably clear language of exclusion." *International Union of Electrical, Radio and Machine Workers v. Westinghouse Electric Corp.*, 218 F.Supp. 82, 84 (S.D.N.Y.1963), *aff'd per curiam*, 326 F.2d 758 (2d Cir. 1964).

■ Furthermore, in accordance with the national policy of encouraging arbitration of labor disputes, *see, e. g., International Association of Machinists and Aerospace Workers v. General Electric Co.*, 406 F.2d 1046, 1048 (2d Cir. 1969), and of giving the parties to a dispute the bargained-for judgment of the designated arbitrator, *see United Steelworkers of America v. American Manufacturing Co., supra*, 363 U.S. at 568, 80 S.Ct. at 1346, "[d]oubts should be resolved in favor of coverage." *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 583, 80 S.Ct. at 1353; *see Gateway Coal Co. v. United Mine Workers of America, supra*, 414 U.S. at 377–78, 94 S.Ct. at 636–637; *Rochdale Village, Inc. v. Public Service Employees Union, Local 80*, 605 F.2d 1290, 1294–95 (2d Cir. 1979).

With these general legal principles in mind, we turn first to the question of

whether any obligation to arbitrate existed at the time the dispute over payment of commissions arose. Such an obligation could be derived either from the existence of the 1975 Agreement itself or from the continuation of obligation to arbitrate after the expiration of the 1975 Agreement.

"Because the duty to arbitrate can be imposed only by contract, it often occurs that questions of contract termination must be decided in order to determine whether a party is under such a duty." *Rochdale Village, Inc. v. Public Service Employees Union, Local 80, supra,* 605 F.2d at 1295. Generally, such questions are for the court. *E. g., Proctor & Gamble Independent Union v. Proctor & Gamble Manufacturing Co., supra.* However,

[i]f a court finds that the parties have agreed to submit to arbitration disputes "of any nature or character," or simply "any and all disputes," all questions, including those regarding termination, will be properly consigned to the arbitrator: "With that finding the court will have exhausted its function, except to order the reluctant party to arbitration."

*Rochdale Village, Inc. v. Public Service Employees Union, Local 80, supra,* 605 F.2d at 1295 (quoting *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 571, 80 S.Ct. 1363, 1364–1365, 4 L.Ed.2d 1409 (1960) (Brennan, J., concurring)). Therefore, because the arbitration clause in the 1975 Agreement in the instant case was broad and because termination allegedly occurred pursuant to a procedure "implicit in [the] contract," [2] the question of termination is itself arbitrable. *See id.* at 1295–96 (quoting *Local 4, International Brotherhood of Electrical Workers v. Radio Thirteen-Eighty, Inc.,* 469 F.2d 610, 613 (8th Cir. 1972).

Furthermore, even if the 1975 Agreement were found to have expired, that would not prevent arbitration of the merits of the dispute itself, because this

Court finds that the obligation to arbitrate would have survived the termination of the 1975 Agreement. The relevant portion of the hiatus between the 1975 Agreement and the 1979 Agreement was covered by a side agreement, or agreed-upon extension of the terms of the expiring agreement—the Settlement Agreement entered into on May 25, 1979. Questions regarding the existence or terms of a side agreement are for the court. *Rochdale Village, Inc. v. Public Service Employees Union, Local 80, supra,* 605 F.2d at 1297.

The Settlement Agreement provided in part: "The terms and conditions of employment currently in effect shall continue during said interim period." Grievance and arbitration procedures are terms and conditions of employment. *General Warehousemen and Employees Union Local 636 v. J. C. Penney Co.,* 484 F.Supp. 130, 135 (W.D.Pa.1980). Thus, it appears that the arbitration provisions of the 1975 Agreement continued in effect in the period after May 25, 1979, during which the dispute over commission rates arose.

Moreover, the Supreme Court has held that a contractual obligation to arbitrate survives expiration of an agreement when the dispute between the parties is over an obligation "arguably created" by the expired agreement, if the agreement included an arbitration clause covering "any" grievance to arise between the parties, not merely those arising "under" the agreement. *See Nolde Brothers, Inc. v. Local 358, Bakery & Confectionary Workers Union,* 430 U.S. 243, 252, 97 S.Ct. 1067, 1072, 51 L.Ed.2d 300 (1977); *accord, Rochdale Village, Inc. v. Public Service Employees Union, Local 80, supra,* 605 F.2d at 1295 n.6. In such a case, "the presumptions favoring arbitrability must be negated expressly or by clear implication." *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionary Workers Union, supra,* 430 U.S. at 255, 97 S.Ct. at 1074.

---

2. The Company claims that the exchange of letters between the parties manifested their intent to terminate the 1975 Agreement, *see* note 1 *supra*, while the Union alleges that their intent was to change a term and condition of employment and not to extinguish the 1975 Agreement in its entirety.

■ In the instant case, the obligation to pay sales commissions was "arguably created" by the 1975 Agreement, and the arbitration provision of Article XVI(A) covered "any dispute" that "shall arise between" the parties. Therefore, this Court finds that the obligation to arbitrate the dispute over the sales commission rates, if found to be arbitrable under Article XVI, would have survived termination of the 1975 Agreement.

The next question to consider is whether the dispute over sales commission rates is arbitrable under the 1975 Agreement. The Company argues that Article XVI(B) of the 1975 Agreement expressly excluded disputes over sales commission rates from the obligation to arbitrate. In support of its argument, the Company cites *Standard Food Products Corp. v. Brandenburg*, 436 F.2d 964 (2d Cir. 1970), in which the court considered an arbitration clause virtually identical to Article XVI of the 1975 Agreement, which is now before this Court. The *Brandenburg* court found the "unmistakably clear language of exclusion," *International Union of Electrical, Radio and Machine Workers v. Westinghouse Electric Corp., supra*, 218 F.Supp. at 84, that is necessary to remove a dispute from the coverage of a broad arbitration clause, such as the ones in *Brandenburg* and the instant case.

There is a fundamental difference, however, between the application of the exclusionary language in *Brandenburg* and the application proposed by the Company in the instant case. The language in the *Brandenburg* arbitration clause, with regard to employer violations of certain enumerated paragraphs of the agreement, explicitly preserves the right of the *union* to seek an injunction from a court or to resort to economic action "without the necessity of first resorting to arbitration." *Compare* 1975 Agreement, Art. XVI(B), *supra*. The *Brandenburg* court used that language in refusing to enjoin a strike by the *union* over a dispute involving a provision of one of the enumerated paragraphs, which seems to be precisely the sort of application intended for the exclusionary language. Here, in contrast, the Company urges the Court to construe the virtually identical language of the arbitration provision in the 1975 Agreement to relieve the *Company* of the obligation to arbitrate a dispute involving one of the enumerated paragraphs.

The language of Article XVI(B) does not explicitly relieve the Company or the Employer of any obligations; moreover, it seems clearly intended to be union-protective rather than employer-protective. Interpreting it in the way the Company proposes would involve stretching the language and reading between the lines, which are certainly inappropriate exercises for a court, given the Supreme Court's admonition that a "court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator." *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 585, 80 S.Ct. at 1354.

■ The limited role of a court in construing even the arbitration clause of a collective bargaining agreement has been repeatedly emphasized by the Supreme Court in cases finding that an arbitration clause is itself arbitrable under certain circumstances. The Supreme Court has stated:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator.

*United Steelworkers of America v. American Manufacturing Co., supra*, 363 U.S. at 567–68, 80 S.Ct. at 1346. The Court also admonished that when a dispute arises as to the "meaning, interpretation and application" of a collective bargaining agreement,

arbitration should be ordered, because, "[w]hen the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal." *Id.* at 569, 80 S.Ct. at 1347. More recently, in *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionary Workers Union, supra,* the Court reiterated:

> "[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."

430 U.S. at 253–54, 97 S.Ct. at 1073 (quoting *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1409 (1960). On the basis of those Supreme Court rulings, this Court finds that the dispute over the construction and effect of Article XVI is itself arbitrable, leaving for the arbitrator the question of whether the dispute over sales commission rates is arbitrable.

The final question is whether the obligation to arbitrate was vitiated by the Settlement Agreement, the strike, or the 1979 Agreement. The Company asserts that those three events negated the presumption of arbitrability of the dispute over payment of commissions, and, in effect, constituted a waiver on the part of the Union of its alleged right to arbitrate. The Union argues that those events did not vitiate the obligation to arbitrate the dispute over commission rates and that, in any event, the question of whether that alleged obligation to arbitrate was destroyed was itself a question for the arbitrator.

■ The issue of whether a Board settlement agreement of an unfair labor practice vitiates a company's contractual obligation to arbitrate the dispute that gave rise to the settlement, to this Court's knowledge, has never been litigated. Courts have frequently noted, however, the differences between arbitration and proceedings before the Board. *See, e. g., Sea-Land Service, Inc. v. International Longshoremen's Association,* 625 F.2d 38, 43 (5th Cir. 1980) ("[T]he existence of such concurrent NLRB jurisdiction is quite plainly extraneous to the arbitral process. It frequently happens that an alleged contractual default will also constitute an unfair labor practice; yet notwithstanding NLRB jurisdiction over the latter, the parties may nevertheless be enjoined to arbitrate the dispute . . . ."); *International Union of Electrical, Radio and Machine Workers v. General Electric Co.,* 407 F.2d 253, 264 (2d Cir. 1968), *cert. denied,* 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969) ("the legal issues before [the Board] and an arbitrator are different"); *Luckenbach Overseas Corp. v. Curran,* 398 F.2d 403, 406 (2d Cir. 1968) ("Different issues are presented in each instance and it is conceivable . . . that the arbitrator could fashion a remedy under the contract which would not conflict with Board policy or the Regional Director's decision."). Thus, this Court does not find the existence of the Settlement Agreement a necessary bar to arbitration. Consequently, arbitration of the sales commission dispute should be allowed if the arbitrator finds that the parties intended Article XVI(B) of the 1975 Agreement not to exclude arbitration of that dispute.

■ The strike and the 1979 Agreement, also, do not vitiate the obligation to arbitrate. Nor does the alleged laches on the part of the Union. The Company's argument, essentially, is that by striking, by entering the 1979 Agreement, and by delaying in seeking arbitration, the Union has waived any right to arbitration it might have had. This Court finds, however, that the question of waiver is itself a question for the arbitrator. Since Article XVI(A) of the 1975 Agreement covered "any dispute" and did not expressly take the issue of waiver outside the sphere of arbitration, the defense of waiver is a question to be resolved by the arbitrator rather than this Court. *See World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 364–65 (2d Cir. 1965); *Hiram Walker v. Local 2,* 90 L.R.R.M. 2971, 2974 (S.D.N.Y. Sept. 30,

1975); *Auxiliary Power Corp. v. Eckhardt & Co.*, 266 F.Supp. 1020, 1022 (S.D.N.Y. 1966).

The issues of the strike, the 1979 Agreement, and laches also fall within the penumbra of the "procedural arbitrability" doctrine established by the Supreme Court in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). Originally, the doctrine applied to disputes over whether the party seeking arbitration had complied with specific contractual conditions precedent to arbitration. The scope of the doctrine was extended in *International Union of Operating Engineers, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), to cover claims by defendants in suits pursuant to section 301 of the LMRA that laches barred arbitration of a dispute arbitrable under a collective bargaining agreement.

For the reasons stated, the Company's motion to enjoin arbitration is denied, and the Union's motion to compel arbitration is granted. The clerk will enter judgment dismissing the complaint and in favor of the defendant directing the plaintiff to arbitrate.

SO ORDERED.