**TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 506, Petitioner,**

v.

**E.D. CLAPP CORPORATION, Respondent.**

**No. 82–CV–130.**

United States District Court, N. D. New York.

Nov. 29, 1982.

---

**5.** At 664 F.2d 687.

Blitman & King, Syracuse, N.Y., for petitioner; James R. LaVaute, Syracuse, N.Y., Jennifer A. Clark, of counsel.

Bond, Schoeneck & King, Syracuse, N.Y., for respondent; Stephen J. Vollmer, John Gaal, Syracuse, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

By their very nature, disputes requiring judicial resolution are adversary proceedings. Despite this adversary quality, the vast majority of lawsuits are conducted with a high degree of respect for both the Court and the opposing parties. Because most controversies are simply attempts to determine the truth, the parties usually strive to provide the forum with an accurate picture of the relevant facts. This factual presentation, although painted in the light most favorable to the respective parties, allows the Court to make an informed decision about the facts of the case under consideration. Once the facts are known, the Court, with the help of the parties through their legal briefs and memoranda, can resolve the dispute by applying the proper legal principles to facts before the Court.

There are occasions, however, when this search for the truth is hampered by the zealousness of the parties. The Court is hesitant to characterize this zealousness in a more serious tone, but the instant case is most unusual. It appears that the parties have become so involved and convinced of the correctness of their positions that the Court has been presented with diametrically opposed versions of the same incidents. It is in this light that the Court renders this Memorandum-Decision and Order.

This action was brought by petitioner, Local 506 [Union], seeking a vacatur of arbitration awards rendered on November 12, 1981. The Union contends that the awards were procured by corruption, fraud, or undue means within the meaning of 9 U.S.C. § 10(a), that there was evident partiality or corruptness on the part of the arbitrator within the meaning of 9 U.S.C. § 10(b), that the arbitrator was guilty of misconduct within the meaning of 9 U.S.C. § 10(c), and that the arbitrator exceeded his powers within the meaning of 9 U.S.C. § 10(d). Respondent E.D. Clapp Corporation [Company] denies these allegations and requests that the Petition to Vacate be denied in all respects.

The Union and the Company were party to a Collective Bargaining Agreement [CBA] dated August 1, 1979, effective from August 1, 1979 through July 31, 1981. Pursuant to Article 10 of the CBA, disputes arising under the agreement are subject to a four step grievance procedure culminating in binding arbitration. During the course of the CBA, a strike by members of the Union occurred and the parties were directed by the Honorable John R. Tenney of the New York State Supreme Court to submit all current disputes to binding arbitration. Thereafter, the New York State Mediation Board appointed John Beich "to convene a meeting of the parties to effect an expeditious and amicable resolution of these disputes."

Arbitrator Beich communicated frequently with Union President Paul Bush and Company President Spencer S. Berger from the date of his appointment on February 6, 1981 to the first of the alleged "hearings" on July 1, 1981. On this date, the parties gathered in Auburn, New York. Although this fact is undisputed, the events of that day are subject to varied interpretation. According to the Company, the parties

agreed that Beich could decide the question of whether the subject disputes were arbitrable *before* proceeding to the merits. This view is supported by the affidavits of Company President Spencer S. Berger, Assistant to the President William C. Lavery, and Company counsel Stephen J. Vollmer. The Union argues, however, that no agreement was reached allowing the arbitrator to first decide the arbitrability question. This position is supported by the affidavits of Union counsel Peter P. Paravati, and Union President Paul Bush.

After this alleged "stipulation" was entered into, the Company contends that a hearing was held on the arbitrability issue. At this hearing, the Company claims that it presented its case on the arbitrability issue, and in so doing, also substantially presented its case on the merits. This view is supported by the affidavits of Company President Spencer S. Berger, Assistant to the President William C. Lavery, and Company counsel Stephen J. Vollmer. To the contrary, the Union asserts that no formal hearing was held. Instead, the Union claims that at this July 1 meeting, Company President Berger refused to allow consideration of anything but the arbitrability issue despite the prior understanding that all issues were to be presented. Berger's conduct, according to the Union, created turmoil, disorder, and chaos, and that under no stretch of the imagination, could that July 1 meeting be considered a hearing. No witnesses were called and the dischargees were never heard from. This position is supported by the affidavits of Company counsel Peter P. Paravati and Union President Paul Bush.

Due to the high degree of acrimony between the parties, it was allegedly agreed that arbitrator Beich be allowed to conduct independent investigations of the disputes and engage in ex parte contacts with the parties and their representatives. According to the Company, this stipulation was signed by the Company as an accommodation to the arbitrator even though it was understood that the arbitrability issue would be reached first. This view is supported by the affidavits of Company President Spencer S. Berger, Assistant to the President William C. Lavery, and Company counsel Stephen J. Vollmer. The Union asserts, however, that the stipulation was entered into for different reasons. It is claimed that arbitrator Beich requested the parties to sign the stipulation in order to "cover" for the arbitrator's past ex parte meetings with the parties. This stipulation, signed by Union President Paul Bush, was understood by Bush to only cover past conduct by the arbitrator. Moreover, Bush charges that the stipulation was altered after he signed it so that Beich could have ex parte contacts in the future. This position is supported by the affidavit of Union President Paul Bush.

After the stipulation was entered into, it appears that the parties agreed to another meeting with the arbitrator. On September 1, 1981, the parties gathered again in Auburn, New York. Once again the events of that day are subject to dispute. According to the Union, Paul Bush objected to certain procedural matters, namely, the sequestration of witnesses. The Union claims that it continually objected to ex parte meetings between the Company and arbitrator Beich and attributes any and all delays to the Company. This view is supported by the affidavits of Union President Paul Bush and Union organizer Donald Oltz. Needless to say, the Company's version of this episode is quite different. According to the Company, when the sequestration of witnesses was requested by the Company, Paul Bush objected on the grounds that it would prevent him from preparing his cases and would be detrimental to the interest of the grievants. When Bush's objections were overruled, he verbally assaulted the arbitrator and was "personally insulting and provoking." This view is supported by the affidavits of Company President Spencer S. Berger, Assistant to the President William C. Lavery, and Company counsel Stephen J. Vollmer. In a supplemental affidavit, Paul Bush specifically denied the Company's account of his "tirade."

At some point in the proceedings on September 1, 1981, arbitrator Beich attempted to question Union witness Bruce Bergeron. According to the Union, Beich tried to coerce Bergeron into signing an agreement stipulating to certain facts before asking any questions. The Union further alleges that these facts by stipulation were prepared by the Company. This view, of course, is supported by the affidavits of Union President Paul Bush and Union organizer Donald Oltz. The Company asserts that all arbitrator Beich asked Bergeron was whether he had left the Company's plant on a given date. At this point, according to the Company, Bush "exploded" again and renewed his tirade against the arbitrator. Not surprisingly, this view is supported by the affidavits of Company President Spencer S. Berger and Assistant to the President William C. Lavery.

The manner in which the September 1, 1981 proceedings concluded is also the subject of a controversy. According to the Union, and of primary importance to the instant Petition to Vacate, arbitrator Beich withdrew from his role as arbitrator and stormed out of the proceedings. As stated in the Union's Petition:

26. At that point, Beich stood up and stated, "[expletive deleted] it, I quit, I'm prejudiced, I never wanted these cases, they are making a patsy out of me." (deletion in original).

27. Bush responded that Beich was acting like a fool, that Bush had never heard of an arbitrator quitting like this, that if he did not sit down and stop this nonsense Bush would call Chairman Healy. Beich responded "I don't give a [expletive deleted] who you call, I quit." (deletion in original).

This view of the arbitrator's "resignation" is supported by the affidavits of Union President Paul Bush, Union organizer Donald Oltz, and Union counsel James LaVaute. The Company's version of the conclusion of the September 1, 1981 meeting bears no mention of Beich's resignation. In fact, the Company asserts that Beich in no way indicated that he was withdrawing or resigning from the case. According to the Company, the meeting concluded because Paul Bush would not allow it to proceed in an orderly fashion. This view is supported by the affidavits of Union President Spencer S. Berger, Assistant to the President William C. Lavery, and Company counsel Stephen J. Vollmer.

Unfortunately, a stenographic record was not taken of either the July 1 or September 1 meetings. With regard to the latter meeting, the Court finds the discrepancies in the above stories to be incredible. Discounting the affidavits of counsel who were not present at the time, the Court is presented with four sworn affidavits, two of which tell diametrically opposed versions of the same incident from the other two. Clearly, the bounds of zealousness have been exceeded.

Following the adjournment of the September 1 meeting, a long series of correspondence flowed between the parties, arbitrator Beich, and Chairman Healy of the New York State Mediation Board. On September 3, 1981, Company President Spencer S. Berger wrote to arbitrator Beich concerning the meeting of two days prior. Berger acknowledged that the Company had agreed on July 30, 1981 to have Beich render his decision as to the arbitrability simultaneously with the merits determination. However, Berger wrote, in view of the Union's conduct at the meeting and its failure to live up to the conditions in the July 30 agreement, the Company was requesting an expedited ruling on the threshold question of arbitrability.

Apparently in response to a telephone conversation, Union President Paul Bush wrote to Chairman Healy concerning the "unilateral withdrawal" of arbitrator Beich. While the Union did not solicit the resignation, according to Bush, it nevertheless accepted it. The Union stated its position that it would accept a substitute arbitrator. This letter, dated September 23, 1981, seemingly crossed in the mail with a September 21 letter from Chairman Healy to Bush and Berger. The Chairman's letter makes no mention of any resignation by Beich, stating:

After consultation with staff arbitrator, John Beich, Esq. relative to the pending arbitrations at E.D. Clapp, pleased be advised that I have requested Mr. Beich to expedite his decisions about the threshold issues of arbitrability.

Upon receipt of his awards, we are prepared to take what other steps may be necessary to conclude these matters.

In response to Chairman Healy's letter, Paul Bush wrote to the Chairman on September 24. Mr. Bush expressed his dismay at the prospect of a decision on the issue of arbitrability alone, and reiterated his position that all issues must be decided simultaneously.

After Paul Bush's September 24 letter to Chairman Healy, the events take a strange twist. It appears, that at an American Arbitration Association seminar in Syracuse on October 1, Chairman Healy met with Union President Bush and counsel for the Union to discuss the pendency of the arbitration proceedings between the Union and the Company. No representative of the Company was present at this meeting. The next day, Chairman Healy wrote to Paul Bush and Spencer Berger and advised that the Mediation Board had held a special meeting to discuss the E.D. Clapp situation. Accordingly, in light of the "unusual nature of the circumstances under which Mr. Beich withdrew as arbitrator, the Board [became] fearful that whoever might be the 'loser' in his awards would seek judicial review" and decided to appoint a panel of arbitrators for new hearings. The Court is at a loss to explain the difference between Chairman Healy's position in this last letter and the September 21 letter relating to the need for expedited decisions on arbitrability. Inasmuch as the Chairman's September 21 letter referred to a consultation with arbitrator Beich *after* the September 1 hearing, the Court can only conclude that the Chairman was influenced by the meeting with the Union at the October 1 seminar.

On October 9, Company President Berger wrote to Chairman Healy expressing his dismay at the prospect of having new hearings and discarding all of the past work of arbitrator Beich. Berger asserts in his letter that the change in the Chairman's position could be traced to the October 1 seminar. The Company summarized its position that it expected procedural rulings from arbitrator Beich before the resolution of any substantive issues and that legal proceedings would be instituted to redress any perceived injustice. Berger wrote to arbitrator Beich on October 23 and reiterated his position that the arbitrability must be decided first. Moreover, Berger referred to past phone conversations in which Beich had reaffirmed the fact that he had not withdrawn from the case.

Finally, on November 12, 1981, the arbitrator rendered his decisions holding that all of the subject disputes were not arbitrable under the terms of the CBA. It is these decisions that the Union seeks to have vacated.

The role of the federal courts in reviewing labor arbitration awards was set forth in three 1960 decisions by the Supreme Court. These decisions have come to be known as the Steelworkers Trilogy. *United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Pursuant to the mandate of the Trilogy, the sole function of the federal courts in an action to compel arbitration is to determine whether the subject matter is one that falls within the scope of the applicable collective bargaining agreement. The courts are to avoid passing on the merits of the controversy and all doubts are to be resolved in favor of arbitration. However, when the court is presented with an action to enforce an arbitration award, the inquiry is limited to the question of whether the award draws its essence from the collective bargaining agreement. If it does, then the court has no choice but to enforce it.

■ In the present case, the Union seeks to have the arbitration awards vacated. Thus, the Court must look to the provision of the United States Arbitration Act, 9 U.S.C. § 10, that covers vacation of arbitration awards. Section 10 provides that the district court may vacate an arbitration award

(a) Where the award was procured by corruption, fraud or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

However, it must be noted that the burden of proof in upsetting the awards rests squarely on the Union. *Cook Indus., Inc. v. Itoh & Co. (America) Inc.,* 449 F.2d 106, 108 (2d Cir.1971), *cert. denied,* 405 U.S. 921, 92 S.Ct. 957, 30 L.Ed.2d 792 (1972); *see also International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548 (2d Cir.1981); *Reed & Martin Inc. v. Westinghouse Elec. Corp.,* 439 F.2d 1268 (2d Cir.1971); *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.,* 375 F.2d 577 (2d Cir.1967).

■ The Court is also aware that "[a]rbitration is essentially consensual and practical. The United States Arbitration Act is obviously designed to protect the integrity of the process with a minimum of insistence upon set formulae and rules." *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 154–55, 89 S.Ct. 337, 342, 21 L.Ed.2d 301 (1968) (Fortas, J., dissenting). Therefore, proof that arbitrator Beich violated the Arbitration Act must be clear and convincing and may not simply be speculation or hard feelings on the part of the Union.

■ The Union argues that the arbitrator was guilty of misbehavior to the prejudice of the Union by failing to disclose his ex parte communications with the Company. This argument is without merit. Both parties were guilty of having ex parte communications with the arbitrator as well as the Chairman of the New York State Mediation Board. The record is full of correspondence to the Chairman and the arbitrator indicating that the other party was not privy to the writing. Here, the acrimonious relationship between the parties led to a total breakdown of respect for the fairness of arbitration process.

As to the claim that the stipulation allowing ex parte contacts was altered *after* Paul Bush signed it, the Court refuses to speculate as to whether the stipulation was in fact changed. Regardless, the Court finds that both the "original" and the "altered" stipulation cover the types of conduct practiced by both parties to this case.

■ The Union further argues that the arbitrator was guilty of partiality and corruption and of procuring the awards by corruption, fraud and undue means. These contentions may similarly be rejected. Upon a review of the entire record in this case and keeping in mind the heavy burden of proof on the party seeking a vacatur, it is clear that the Union has failed to meet this burden. Rather, the only thing that the record shows is that each party has presented its own version of the events leading up to the awards issued by arbitrator Beich on November 12, 1981. In the Court's view, these two views are entirely contradictory. Accordingly, it cannot be said that the Union has properly proved its case on this point.

Much is made by the Union of the fact that the arbitrator "falsely swore" that a hearing had been held and that both parties had had a full opportunity to present their respective cases. As noted by the Company, this affirmation by the arbitrator was contained on a printed form of arbitration award. Moreover, there is nothing to indicate that this statement was affirmatively

placed on the face of the award by the arbitrator for the purpose of defrauding the Union.

With regard to the Union's claim that the arbitrator was guilty of evident partiality, the Supreme Court has held that arbitrators should avoid the appearance of bias or partiality. *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. at 150, 89 S.Ct. at 340. However, an award will not be vacated on the grounds of evident partiality of the arbitrator unless the conduct of the arbitrator was so biased and prejudiced as to destroy fundamental fairness. *Cook Indus., Inc. v. C. Itoh & Co. (America) Inc.,* 449 F.2d at 107–08; *Reed and Martin, Inc. v. Westinghouse Elec. Corp.,* 439 F.2d at 1275; *Ballantine Books, Inc. v. Capital Distrib. Co.,* 302 F.2d 17, 21 (2d Cir.1962); *Catz Am. Co. v. Pearl Grange Fruit Exch., Inc.,* 292 F.Supp. 549, 551–53 (S.D.N.Y.1968). In the instant case, there is no clear evidence of partiality on the part of the arbitrator. Again, the Court has been presented with conflicting stories and cannot determine whether arbitrator Beich was in fact partial to the detriment of the Union. In the absence of a record from the hearings, the Court declines to agree with the Union on this issue and finds that the arbitrator was not evidently partial within the meaning of Section 10 of the United States Arbitration Act. 9 U.S.C. § 10(b).

In addition, the Union claims that arbitrator Beich exceeded his powers by refusing to conduct a hearing and by issuing the awards after his resignation. As recounted earlier, there is certainly a conflict in the proof concerning the alleged resignation or withdrawal of the arbitrator on September 1, 1981. The Union claims that Beich explicitly withdrew. The Company claims that he did no such thing. With a clear conflict in the evidence, it cannot be said that the Union has met its burden of proof on this issue. Moreover, a common sense review of the record leads to the conclusion that Beich did not withdraw as arbitrator. First, if Beich had withdrawn, he would not have issued the arbitration awards on November 12. Second, Chairman Healy's letter of September 21 indicates that Beich made no mention of any withdrawal after consulting with the Chairman following the September 1 hearing. Thus, it seems unlikely that Beich did in fact withdraw.

The claim that Beich exceeded his powers by refusing to conduct a hearing raises a far more serious issue. If in fact, no hearings were held, then the awards would have to be vacated. In this regard, the Court must look to the two separate hearing dates, July 1 and September 1, to see if the Union was denied its right to be heard. On July 1, the record shows that the Company presented evidence to the arbitrator. For one reason or another, it appears that the Union did not present any evidence, or if any evidence was presented, that it did not constitute the Union's entire case. This did not amount to a violation of the Union's right to be heard because it was subsequently agreed that another hearing would be held. While it is heavily disputed that the parties agreed on July 1 to decide the issue of arbitrability first, the record discloses that the Company later agreed to allow consideration of the substantive issues simultaneously with the threshold issue of arbitrability. Still, the Company argues that this agreement was subject to the condition that no further hearings would be held.

On September 1, the parties assembled in Auburn, New York for the second hearing. As noted above, this hearing ended abruptly due to disturbances from one or both of the parties. Thus, the hearing ended without both sides being allowed to fully present all of their evidence via documents and/or testimony. In the Company's view, the termination of the September 1 hearing voided its prior agreement to allow for simultaneous consideration of the merits as well as arbitrability. Although the Company argues that its agreement was conditioned upon the fact that no further hearings would be held, it cannot unilaterally rescind its agreement after participating in the second hearing.

The law is clear that a federal court cannot overturn an arbitration award unless the party opposing the award shows that one of the statutory grounds enumer-

ated in 9 U.S.C. § 10 exists. *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108 (2d Cir.1980). Here, the Court finds that the arbitrator violated section 10(c) by refusing to hear evidence pertinent and material to the controversy.

After the close of the hearing on September 1, 1981, the Union was not given an opportunity to complete its presentation of proof regarding the arbitrability and/or merits of the grievances then under consideration. In view of the agreement to allow simultaneous consideration of the merits along with arbitrability, principles of fundamental fairness required that the Union be given a full opportunity to present its case to the arbitrator for consideration. The Court expresses no opinion as to the correctness of the subject awards which found the grievances to be non-arbitrable. Nevertheless, assuming that the grievances were indeed non-arbitrable, the Union still should have been given a chance to present its case on *both* the arbitrability *and* merits issues. The parties agreed to have arbitrator Beich consider both questions together. Since the Union was not given the chance to present its case in full, the subject awards cannot stand. Accordingly, it is hereby

ORDERED, that petitioner's motion to vacate the arbitration awards rendered on November 12, 1981 be granted.