**In the Matter of the Arbitration between INTERNATIONAL LONGSHORE-MEN'S ASSOCIATION, AFL–CIO, Petitioner,**

**v.**

**DELTA STEAMSHIP LINES, INC., Respondent.**

**No. 84 Civ. 2493 (SWK).**

United States District Court, S.D. New York.

May 22, 1986.

Thomas W. Gleason, New York City, for petitioner.

Gibson, Dunn & Crutcher, New York City by John A. Herfort, for respondent.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

### FACTUAL BACKGROUND

In September, 1983, the International Longshoremen's Association, AFL–CIO ("ILA"), which acts as the collective bargaining representative for substantially all longshoremen and related waterfront employees in 36 ports from Maine to Texas, entered into an agreement ("September Agreement")[1] with the New York Shipping

1. The text of the September Agreement is as follows:

AGREEMENT
NEW YORK SHIPPING ASSOCIATION, INC. (NYSA)
COUNCIL OF NORTH ATLANTIC SHIPPING ASSOCIATIONS (CONASA)
WEST GULF MARITIME ASSOCIATION (WGMA)
NEW ORLEANS STEAMSHIP ASSOCIATION, INC. (NOSSA)
MOBILE STEAMSHIP ASSOCIATION, INC. (MSSA)
SOUTHEAST FLORIDA EMPLOYERS ASSOCIATION (SFEA)
and
SOUTH ATLANTIC EMPLOYERS NEGOTIATING COMMITTEE (SAENC)
with the
INTERNATIONAL LONGSHOREMEN'S AS-
SOCIATION, AFL–CIO (ILA)
on the
SEVEN (7) MASTER CONTRACT ISSUES

The following is agreed to by NYSA, CONASA, WGMA, NOSSA, MSSA, SFEA and SAENC hereinafter referred to as "Management" and ILA (as a substitute for the Master Agreement of April 16, 1983 which is hereby revoked) in final and complete settlement of the seven (7) Master Contract issues:

1. WAGES

1st year—an increase of $1.00 per hour making a straight time rate of $15.00 per hour
2nd year—an increase of $1.00 per hour making a straight time rate of $16.00 per hour
3rd year—an increase of $1.00 per hour making a straight time rate of $17.00 per hour

2. CONTRIBUTIONS TO THE WELFARE PLANS

Association, Inc. ("NYSA"). NYSA is a multiemployer bargaining association, whose members include stevedores, steamship carriers and other employers of longshore labor in the Port of New York. NYSA negotiates and administers collective bargaining agreements on behalf of employers engaged in longshore operations. Delta Steamship Lines, Inc. ("Delta"), which was a member of NYSA between 1978 and 1984, is a steamship carrier engaged in transporting cargo by sea in foreign and interstate commerce.

ILA has traditionally entered into agreements with multiemployer bargaining associations. Since 1981, the ILA and multiemployer bargaining groups have reached agreements concerning seven "Master Contract" items: wages, hours, the term of the agreement, contribution to welfare and pension plans, containerization, and LASH.[2]

With respect to the Master Contract, ILA acts as the collective bargaining representative for ILA locals in all 36 ports.

ILA also negotiates non-Master Contract items, *e.g.*, overtime, seniority, safety and holidays. These items are negotiated separately by local port associations and ILA locals after the Master Contract items are finalized. When agreements are reached on the local issues, both parts of the contract are presented to the local ILA membership for ratification. Thus, collective bargaining is conducted on both a coast-wide and a port-by-port basis.

Negotiations leading to the September Agreement began in March, 1983. Management associations representing 35 of 36 ports negotiated jointly with ILA. Delta was a member of three of those

1st year—an increase of 17 [cents] per hour making a total contribution of $2.17 per hour
2nd year—an increase of 17 [cents] per hour making a total contribution of $2.34 per hour
3rd year—an increase of 16 [cents] per hour making a total contribution of $2.50 per hour
3. CONTRIBUTIONS TO THE PENSION PLANS
1st year—an increase of 25 [cents] per hour making a total contribution of $3.25 per hour
2nd year—an increase of 25 [cents] per hour making a total contribution of $3.50 per hour
3rd year—an increase of 25 [cents] per hour making a total contribution of $3.75 per hour
The amounts in Items "2" and "3" above may be allocated to fringe benefits as agreed to by the local ILA and Port Associations.
4. HOURS
To remain as in present agreement
5. TERM OF AGREEMENT
Three (3) Year Contract
1st year—commencing on October 1, 1983 to September 30, 1984
2nd year—commencing on October 1, 1984 to September 30, 1985
3rd year—commencing on October 1, 1985 to September 30, 1986
6. CONTAINERIZATION
As set forth in the appended Containerization Agreement and Rules on Containers except that Paragraph 8 in each of said Agreements shall be amended to provide that, should the 60-day written notice be given on the grounds set forth in said Paragraph 8, the parties agree to enter into negotiations and either party shall have the right to renegotiate any and all terms or conditions of the Master Agreement. In addition, the JSP program shall be updated and extended by the Carriers. The level of assurance for each

year shall be the man hour or tonnage level obtained by adding the man hours or tonnage level assessed in each of the three years of the prior collective bargaining period and obtaining an average by dividing the three-year total by three. In addition, the parties agree that there shall be a new JSP Collection Committee, for the collection of all JSP assessments, which shall contain representatives of the Carriers, Management and ILA.
7. LASH
As set forth in appended LASH–SEABEE Agreement.
8. SIGNATORIES
If any carrier does not subscribe to this Agreement and the appended JSP Agreement, the ILA shall have the right not to work on the loading and discharging of its ships or any work ancillary thereto.

\* \* \* \* \* \*

In order to permit Management and ILA in each of the Management-ILA ports to reach full and final agreement on local conditions, an extension to and including January 15, 1984 is hereby agreed to between the parties. It is further agreed that in the event of a reopening pursuant to the provisions of Paragraph 6 hereof that the effective date of any contract termination shall not be earlier than January 15, 1984.
Dated: Bal Harbour, Florida
 September 26, 1983
(Signatories Omitted)

2. Containerization is the process of transporting cargo in large containers. LASH stands for "Lighter Aboard Ship" and permits fully loaded barges to be moved on and off vessels intact.

associations: NYSA, the New Orleans Steamship Association ("NOSA"), and the West Gulf Maritime Association ("WGMA"). ILA and the management associations reached an agreement on the Master Contract items in April, 1983. NYSA signed that agreement on behalf of numerous employers, including Delta, on April 16, 1983.

After reaching agreement on the Master Contract items, negotiations on the local level began. These negotiations were interrupted in early September when the parties reopened negotiations regarding the Master Contract items due to new developments in containerization litigation taking place in the federal courts. While the particulars of this litigation are irrelevant for resolving this motion, the parties abandoned the April 16, 1983 Agreement and a new Agreement concerning the Master Contract items was made on September 26, 1983. The final paragraph of the September Agreement provided an extension to January 15, 1984 to allow "Management and ILA in each of the Management-ILA ports to reach full and final agreement on local conditions."

By January 15, 1984, the local agreements were not finalized. ILA and the employer associations, including NYSA, lengthened the extension to February 8, 1984, to give the individual ports additional time to complete the 1983–86 local contract negotiations. NYSA participated in the local negotiations affecting the port of New York, which were finally concluded in New York on January 26, 1984. Local negotiations were concluded in New Orleans on February 2, 1984, and in the West Gulf on February 6, 1984. By February 8, 1984, all local contracts were finalized and the entire package was ratified in all 35 ports. In resolving the instant motions, this Court must determine, *inter alia*, whether the September Agreement is binding on Delta and if so, whether that agreement requires Delta to arbitrate ILA's claims.

In January, 1984, while bargaining over the local contracts was taking place, negotiations over another agreement began. These negotiations led to the formation of an agreement between ILA and the various management associations on January 25, 1984 ("January Agreement").[3] The bind-

3. The text of the January Agreement is as follows:

AGREEMENT
between
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO
and
UNDERSIGNED STEAMSHIP CARRIERS SUBSCRIBING TO THE MASTER AGREEMENTS AND AGREEMENTS WITH
NEW YORK SHIPPING ASSOCIATION, INC.
COUNCIL OF NORTH ATLANTIC SHIPPING ASSOCIATIONS
SOUTH ATLANTIC EMPLOYERS NEGOTIATING COMMITTEE
SOUTHEAST FLORIDA EMPLOYERS ASSOCIATION
MOBILE STEAMSHIP ASSOCIATION, INC.
WEST GULF MARITIME ASSOCIATION
NEW ORLEANS STEAMSHIP ASSOCIATION

This Agreement made this 25th day of January, 1984 by and between the undersigned Steamship Carriers and the International Longshoremen's Association, AFL–CIO for itself and on behalf of all of its affiliated Locals in all 36 ILA ports on the North Atlantic, South Atlantic and Gulf Coasts of the United States.
WITNESSETH:
WHEREAS, the Steamship Carriers and the Management Associations recognize the Interna-

tional Longshoremen's Association, AFL–CIO (ILA) as the exclusive Collective Bargaining Agent for all longshoremen, clerks, checkers, maintenance men and other related deep sea craft employees employed or utilized by such steamship carriers to load and unload their steamship vessels in such of the 36 ILA ports designated herein in which such carriers load or unload their ships, and

WHEREAS, the parties hereto desire to set forth the nature and scope of the relationship between the parties on all Master Contract issues and Local Contract issues in all said ILA ports;

NOW THEREFORE the parties agree as follows:

I. The ILA is recognized as the exclusive Collective Bargaining Agent and representative of all longshoremen, checkers, clerks, maintenance men and other ILA craft employees employed or utilized by such Steamship Carriers in [the] loading and discharging of cargo on all of their ships engaged in the foreign or domestic trade of the United States to the extent and when they call at any of the 36 ILA ports designated in Appendix A.

II. Said Steamship Carriers by executing this Agreement hereby subscribe to and become parties to the following Agreements and any

ing effect of, and the obligations arising from, the January Agreement, is also disputed.

ILA's stated goal in implementing the January Agreement was to enlist carriers to subscribe directly (not merely through their collective bargaining representatives) to the various contracts which formed the collective bargaining agreement. · ILA desired to bind those vessels which did not belong to any employer association, and thus, were not parties to the ten agreements ("enumerated agreements") listed in paragraph II of the January Agreement. Thus, the January Agreement was not created to bind carriers such as Delta, since such carriers were already bound to most, if not all, of the enumerated agreements by virtue of their membership in the management associations.

After the January Agreement was formed, the individual carriers were asked to subscribe to the agreement. Delta refused,[4] and withdrew via telegram from NOSSA on February 2, 1984 and WGMA and NYSA on February 6, 1984. Thus, Delta withdrew from NYSA two days before the September Agreement was finally ratified.

ILA challenged Delta's refusal to sign the January Agreement. On April 3, 1984, ILA filed a written grievance with the Management-ILA Emergency Hearing Panel ("the Panel") and requested a hearing. ILA alleged that Delta violated the terms of the January Agreement by, *inter alia*, failing to "subscribe to the Master Agreement and Agreements with the Local Port Associations." Additionally, ILA stated that Delta "ha[d] engaged in wilful viola-

---

amendments thereto with the same force and effect as if said Steamship Carrier actually executed, signed and subscribed to said Agreements. Said Agreements are the following:
1. The Master Agreement first executed May 27, 1980 as thereafter amended on April 16, 1983 and on September 26, 1983.
2. The Management ILA Agreement dated December 6, 1980.
3. The Resolution of March 26, 1981.
4. The Tampa Agreement of May 4, 1981.
5. The Charleston Agreement of May, 1981.
6. The Work Incentive Agreement of June 19, 1981.
7. The Rules on Containers as now in effect and as may hereafter be amended in accordance with its terms.
8. The Containerization Agreement.
9. The JSP Agreement.
10. Each and every Local Agreement which may hereafter be entered into or which is presently in effect in each of said 36 ILA ports affecting the terms and conditions of employment of employees actually employed or utilized aboard the steamship vessels of said Steamship Carriers.
III. The Steamship Carriers agree to be bound by the determination of the various management and labor tribunals named in each said Master and Local Agreements.
Any determination of the tribunal named in the Master Agreement or in any of the Local Agreements shall have the effect of an arbitration determination and may be enforced by either party in any Federal District Court having jurisdiction of the parties.
IV. Nothing contained herein shall require any carrier to be liable for any contributions to any ILA fringe benefit funds not required to be paid

by such carrier, if it employs a stevedore who has given sufficient surety to pay such stevedore contributions to such funds if the carrier has paid the stevedore under the stevedoring contract.
V. Should any carrier fail or refuse to sign or having signed and subscribed to this Agreement refuse to abide by any determination duly issued in accordance with this Agreement and the Agreements made a part hereof, then and in that event on 24 hours telephonic or written notice, the ILA shall have the right to refuse to supply labor and to picket or otherwise hinder the operation of the steamship carrier to the full extent permitted by applicable law.
IN WITNESS WHEREOF the parties hereto have signed this Agreement by their principal officers and in the event of a signature by an Agent, such Agent shall append hereto a written authorization from the carrier authorizing the execution of this document.
Dated in the Port of Miami, and the State of Florida, on this 26th day of January 1984. (Signatories Omitted).

4. Delta gave numerous reasons for refusing to sign the Agreement. For example, Delta maintained that ILA attempted to use the January Agreement to bind carriers to more than one local agreement by improperly bypassing local negotiations. This strengthened ILA's monopoly on dockside work and created a "bizarre result", whereby membership in the NYSA was sufficient to bind Delta to local agreements in ports which Delta never planned to enter. Additionally, Delta argues that had it signed the January Agreement, it would have relinquished its right to use non-ILA labor at every port on the East and Gulf coasts.

tions of the batching provisions of the Rules on Containers and the Containerization Agreement."

Delta refused to attend the hearing, stating that it was not bound to the January Agreement. ILA responded on April 9, 1984 by filing a petition to compel Delta to arbitrate, which is presently before the Court.[5] In its petition to compel arbitration, ILA argues that arbitration is mandated by the Work Incentive Agreement of June 19, 1981, which is incorporated by reference in the January Agreement. Specifically, ILA relies on paragraph 6 of the Work Incentive Agreement, which provides:

F. Charges of alleged violations of the Master Agreement involving more than one port shall be referred directly to the Management-ILA Emergency Hearing Panel for final determination.

In its petition, ILA also relies on paragraph III of the January Agreement, which binds all steamship carriers to determinations made by the various management and labor tribunals named in the Master Agreement or any of the local agreements. Paragraph III continues that any such determination shall have the effect of an arbitration decision and may be enforced by either party in any federal district court having jurisdiction over the parties.

Meanwhile, on April 8 and 9, 1984, Delta ships entered a port facility in Jacksonville, Florida. Delta used the non-ILA stevedoring services of its sister company, Terminal Operators ("TOPS"). On April 10, 1984, ILA sought a temporary restraining order enjoining Delta from using non-ILA labor to unload its vessels in Jacksonville or any of the other ports covered by the January Agreement. This Court denied ILA's application on April 10, 1984 and three days later, ILA withdrew its motion for a preliminary injunction.

Additionally, on April 9, 1984, ILA filed the second of numerous grievances[6] against Delta, pursuant to the January Agreement. ILA alleged that Delta violated the Amended Containerization Agreement of July 29, 1983, incorporated by reference in the January Agreement, by using non-ILA labor to unload its ships in Jacksonville. ILA invoked the procedures of the Amended Containerization Agreement, which allowed ILA and NYSA to submit grievances to the Executive Committee of the Panel on an expedited basis.

The Committee scheduled a hearing for April 11, 1984. Delta again refused to attend, stating that it was improper for the Panel to conduct a hearing while ILA's petition to compel arbitration was pending before this Court. Delta did not move for a stay at this time. (See footnote 6, *supra*). The Panel met in Delta's absence and issued an award, assessing liquidated damages of $172,000 against Delta and directing Delta to comply with the Containerization Agreement. ILA now moves to confirm and enforce this arbitration award.

---

5. In its petition to compel arbitration, the ILA bases jurisdiction on the United States Arbitration Act, 9 U.S.C. § 4, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 141, *et seq.* In its petition to confirm and enforce the arbitration award, the ILA bases jurisdiction on Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), the United States Arbitration Act, 9 U.S.C. § 9 and 28 U.S.C. § 1337. Both actions were filed separately and subsequently consolidated by this Court on May 14, 1984.

6. ILA filed additional grievances on May 3, 8, 10, 16, 21, 22 and June 12, alleging violations of the Containerization Agreement. Although Delta has refused to attend these hearings also, the Panel has assessed liquidated damages in the amounts of $360,000, $200,000, $500,000, $640,-000, $2,696,000, $2,710,000 and $6,000,000 respectively. On May 14, 1984, ILA moved to enforce two of these awards in 84 Civ. 3377 (SWK) and 84 Civ. 3378 (SWK). On September 9, 1985, this Court granted Delta's motion to stay these two actions pending the resolution of the instant action.

After ILA moved to enforce the initial award, which is the subject of the instant action, Delta moved in a separate action, 84 Civ. 8104 (SWK), to stay further arbitration proceedings. However, this action was resolved by stipulation and order dated November 19, 1984. ILA agreed to file grievances (which must be brought within 90 days) without pressing for resolutions. In short, these grievances are "tabled".

In sum, ILA moves to compel Delta to arbitrate ILA's outstanding claims and to confirm an arbitration award. ILA later moved for summary judgment regarding its motion to confirm the arbitration award. Delta moves to dismiss or, in the alternative, for summary judgment with respect to both motions.[7]

## DELTA'S CLAIMS

Delta vigorously contests the binding nature of both the September and January Agreements. Delta primarily contends that since it never signed the January Agreement, no binding contract exists which requires Delta to arbitrate ILA's claims. By refusing to sign the January Agreement, Delta maintains it rejected the enumerated agreements, including the September Agreement.

Delta also argues that NYSA is incapable of binding Delta to the January Agreement since the Agreement provides that the "undersigned Steamship Carriers" must execute the Agreement. Delta contends that even if NYSA could bind Delta to this Agreement, Delta withdrew from NYSA in a timely fashion,[8] thereby eliminating the binding effect of NYSA's ratification of the January Agreement. In short, Delta maintains that the January Agreement was a substitute for all pre-exisitng agreements; it abrogated all earlier contracts, including the September Agreement.

Delta argues that even if its failure to subscribe to the January Agreement did not abrogate the September Agreement, the September Agreement never applied to Delta. Delta argues that the September Agreement did not become effective until February 8, 1984, when the Master Contract items were ratified along with the local agreements. Since Delta withdrew from NYSA on February 6, 1984, Delta argues that it was never bound to the September Agreement. Since NYSA's by-laws provide that a member's timely withdrawal from NYSA relieves the member from agreements negotiated by NYSA, Delta maintains NYSA was powerless to bind Delta to any agreement.

Delta asserts that even if the September Agreement is binding on Delta, the Agreement fails to contain any provision requiring Delta to arbitrate ILA's claims. Specifically, Delta argues that ILA has not shown how the September Agreement incorporates the Work Incentive Agreement or the Amended Containerization Agreement—the alleged sources of Delta's duty to arbitrate.

Delta also raises a host of affirmative defenses.[9] Delta argues, *inter alia*, that the Arbitration Act does not apply to collective bargaining agreements involving workers engaged in foreign or interstate commerce; that the January 1984 contract was an illegal "pre-hire" agreement; that Delta was not an employer of ILA workers; that the Panel was incapable of reaching an impartial decision since it was biased against Delta; that the Panel committed prejudicial misconduct by conducting a hearing while ILA's petition to compel arbitration was pending and by issuing damage awards disproportionate to the alleged injuries sustained; and that both the January and September Agreements violated numerous provisions of the Labor Management Relations Act, 29 U.S.C. § 151 *et seq.*[10] and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*[11]

---

**7.** Since matters outside the pleadings have been submitted by the parties and considered by the Court, the motion to dismiss has been converted to one for summary judgment. *See* Fed.R.Civ.P. 12(c).

**8.** Article IV § 3 of NYSA's bylaws provides that members are bound to agreements ratified by the association except that where members reject agreements in writing within fourteen days after the ratification, the member "shall be considered to have withdrawn from the Association ..."

**9.** ILA argues that these defenses must be raised in the context of an arbitration hearing.

**10.** Delta argues that the Containerization Agreement violates Section 8(e) of the NLRA. Delta allegedly violated the Preamble to the Rules on Containers which provides, in part, that management will not directly perform or contract out work performed on a container water-

Finally, Delta states that ILA's efforts to "cloud the issues" may lead to judicial consideration of the September Agreement "as a possible separate contract nexus between Delta and the ILA." Delta's Reply Memorandum, Dated May 24, 1984, at 64. Delta requests that before such a ruling is rendered, Delta be permitted discovery on the issue of when the September Agreement became effective. *Id. See also* Declaration of John A. Herfort, Dated May 24, 1984, at 2.

In sum, Delta argues that it is not bound to either the September or January Agreement and thus, is not required to arbitrate ILA's claims.

## ILA'S CLAIMS

ILA maintains that the January Agreement is simply an unusual, supplemental interim agreement formed by management and labor in their collective bargaining relations. ILA admits that Delta never signed the January Agreement, but maintains that NYSA, in its representational capacity, signed the Agreement on Delta's behalf. ILA argues that Delta did not withdraw from NYSA early enough to halt the binding effect of the January Agreement.

ILA argues that even if Delta's withdrawal from NYSA precluded NYSA from binding Delta to the January Agreement, Delta's contract with NOSSA and WGMA contained no similar withdrawal provisions. Thus, ILA contends that Delta's membership in NOSSA and WGMA also binds Delta to the January Agreement.

ILA vigorously argues that the January Agreement never abrogated the September Agreement. ILA notes that when labor and management adopt a new Master Agreement, explicit language is used to render the earlier agreement void. No such language appears in the January

front facility "unless such work on such container waterfront facility is performed by employees covered by Management-ILA Agreements."

Agreement. Additionally, since ILA already had a contractual hold over a majority of the carriers through the enumerated agreements, ILA had no incentive to allow carriers to disaffirm these agreements by simply refusing to subscribe to the January Agreement. ILA maintains that it is absurd to suggest that by rejecting the January Agreement, Delta could renege on the September Agreement as well.

Finally, ILA argues that the September Agreement alone is binding on Delta. ILA maintains that Delta did not withdraw from NYSA early enough to reject the September Agreement either. The September Agreement incorporates the Work Incentive Agreement and the Containerization Agreement—both of which contain provisions requiring Delta to arbitrate the instant claims.

In sum, ILA argues that Delta was bound to both the January and September Agreements by virtue of its membership in the management associations which adopted these agreements. ILA asserts that Delta's failure to subscribe to the January Agreement did not abrogate the enumerated agreements, which included the September Agreement. Additionally, according to ILA, even if the January Agreement is not binding on Delta, the September Agreement is valid, and that agreement forces Delta to submit to arbitration.

## THE LAW

 A Court must be ever·mindful of the strong national policy favoring arbitration of labor disputes. *Rochdale Village, Inc. v. Public Service Emp.*, 605 F.2d 1290, 1294 (2d Cir.1979). "This presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective bargaining agreements, 'furthers the national labor policy of peaceful resolution of labor

11. Delta also contends that both the September and January Agreements violated the antitrust laws because they require carriers to boycott non-ILA stevedoring companies and establish a joint monopoly in stevedoring companies organized by the ILA.

disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining.'" *AT & T Technologies v. Communications Workers of America*, —— U.S. ——, ——, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986); *see also, Iowa Beef v. Amalgamated Meat Cutters*, 627 F.2d 853, 856 (8th Cir.1980) ("federal judicial policy overwhelmingly favors arbitration of labor disputes"). "Arbitrators, who are chosen for their knowledge of the practices of the industry and the shop, have the primary responsibility for interpreting the agreement." *Conn. L & P v. Loc. 420, Int. Bro. of Elec. Wkrs.*, 718 F.2d 14, 19 (2d Cir.1983). Since the ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, judicial deference is to be shown an arbitrator's decision on the merits. *Id.* The favored status of arbitration derives from Congress' declared policy of promoting industrial peace through the collective bargaining process, rather than through the courts or economic warfare. *Hahnemann U. v. Dist. 1199C, N.U. of H. & H.C.E.*, 765 F.2d 38, 41 (3rd Cir.1985).

■■■ There is no general duty to submit labor disputes to arbitration. *Rochdale*, 605 F.2d at 1294. "Rather, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id., quoting, United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). *See also McAllister Bros. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir.1980). The question whether a party is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties. *Gallo Wine v. Wholesale Wine*, 511 F.Supp. 785, 789 (S.D.N.Y.1981).

■■■ However, the Court may not rule on the potential merits of the underlying claims, *AT & T Technologies*, —— U.S. at ——, 106 S.Ct. at 1419, and is limited to determining whether there is a collective bargaining agreement between the parties and whether the alleged dispute falls within the agreement's arbitration provision. *Gallo Wine*, 511 F.Supp. at 789.

## CONTRACT TERMINATION

■■■ Because a duty to arbitrate can be imposed only by contract, questions of contract termination must often be decided to determine whether a party is under such a duty. *Rochdale*, 605 F.2d at 1295. Generally, whether a contract has terminated is a decision for the Court, not the arbitrator. *Id. See also Hudson-Berlind Corp. v. Local 807, Intern. Broth.*, 597 F.Supp. 1282, 1284 (E.D.N.Y.1984) ("Generally questions of collective bargaining agreement termination are for the court rather than for the arbitrator."). An exception exists where a Court finds that the parties have agreed to submit to arbitration "[disputes] of any nature or character" or "any and all disputes." *Rochdale*, 605 F.2d at 1295. In such instances, questions regarding termination are properly reserved for the arbitrator. *Id.*

## WITHDRAWAL FROM MULTIEMPLOYER BARGAINING UNITS

The well-established rule regarding employer withdrawal from collective bargaining on a multiemployer basis was initially established in *Retail Associates Inc.*, 120 N.L.R.B. 388 (1958). There, the National Labor Relations Board (the "Board") stressed the importance of controlling union or employer withdrawal from collective bargaining activities on a multiemployer basis. The Board stated that the need for stability dictates that "reasonable controls limit the parties as to the time and manner that withdrawal will be permitted from an established multiemployer bargaining unit." 120 N.L.R.B. at 393–94. The Board thus arrived at the following rule, which has remained unchanged:

An employer or union may withdraw from multiemployer bargaining for any reason provided that it gives adequate written notice prior to the date set for renegotiation of the existing contract or the date on which negotiations actually

commence. *Once negotiations start, a party can withdraw only with the "mutual consent" of the parties or where "unusual circumstances" exist.*

*Local 145, Intern. Garment v. Fashion Assoc.,* 596 F.Supp. 77, 79–80 (D.N.J.1984) (emphasis added), *citing, Retail Associates, Inc.,* 120 N.L.R.B. at 395. This rule has been widely adopted by the circuits and is the law in the Second Circuit. *See Charles D. Bonanno Linen Service v. N.L.R.B.,* 454 U.S. 404, 411, 102 S.Ct. 720, 724, 70 L.Ed.2d 656 (1982); *N.L.R.B. v. Hayden Electric, Inc.,* 693 F.2d 1358, 1364 (11th Cir.1982); *N.L.R.B. v. Independent Ass'n of Steel Fabricators, Inc.,* 582 F.2d 135, 145–46 (2d Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979).

With these principles in mind, the Court turns to the standards for granting a motion for summary judgment. In this Circuit, a party moving for summary judgment must show that there is an absence of a genuine issue as to any material fact. *United States v. Bosurgi,* 530 F.2d 1105, 1110 (2d Cir.1976). In reviewing a Rule 56 motion, the Court is obliged to resolve all reasonable doubts and draw all inferences in favor of the opposing party. *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The motion will be denied whenever there is a genuine issue of material fact or it is unclear that the moving party is entitled to judgment as a matter of law. *Chappell & Co. v. Frankel,* 367 F.2d 197, 203 (2d Cir.1966).

## DISCUSSION

■ Delta's failure to subscribe to the January Agreement did not abrogate the enumerated agreements listed in paragraph II of the January Agreement, which includes the September Agreement, the Containerization Agreement and the Work Incentive Agreement of June 19, 1981.[12]

The evidence indicates that the parties involved in negotiating the January Agreement never intended it to be a means of negating the enumerated agreements. The Chairman and Chief Executive Officer of Seapac Services, Inc., an agent for a major container steamship carrier, was present at the negotiations leading to the formation of the January Agreement. Everhard states that during negotiations, no one mentioned that the September Agreement was replaced by the January Agreement or that "carriers were emancipated from their obligations under all the pre-existing contracts and now had the choice of signing the [January Agreement] or be divorced from their relationship to the ILA." Affidavit of Conrad Everhard, Sworn to on June 7, 1984, at 2. Everhard maintains that in all discussions concerning the January Agreement, it was understood that the January Agreement was a supplement to the 1983 Master Agreement, "leaving intact all obligations under pre-existing contracts." *Id.*

Similarly, the Vice President of Labor Relations at United States Lines, Inc. was a member of the joint management negotiating team which negotiated the January Agreement. He maintains that "it was never contemplated that any carrier who failed to sign the January 25 Agreement would be relieved of any obligations it had under other contracts. No such idea was ever discussed or even mentioned." Affidavit of Robert B. Murphy, Sworn to on June 7, 1984, at 2.

Finally, Thomas Gleason, who negotiated the January Agreement on behalf of ILA, in referring to Delta's argument that the January Agreement was intended to abrogate all prior contracts between ILA and management, states:

As the man who negotiated the January [A]greement for the union, I swear unequivoca[l]ly that such an idea never entered my mind. In fact, nobody but Del-

---

12. ILA contends that the broad arbitration clauses in the local agreements require that the termination issue be resolved by the arbitrators. This argument is rejected. Where the alleged termination is based on a separate agreement, the Court must resolve this issue. *Rochdale,* 605 F.2d at 1297. *See also Intern. Broth. of Elec. v. Freedom WLNE-TV,* 760 F.2d 8, 11 (1st Cir. 1985).

ta's lawyers ever suggested such a thing ... we already had a Master Contract negotiated for 1983, as well as the subsidiary and incorporated agreements ... We wanted more protection, not less. Why on earth would we give the carriers the option to just walk away, when our admitted motivation was to bind them closer?

Affidavit of Thomas W. Gleason, Sworn to on June 7, 1984, at 18.

Additionally, a plain reading of the contract supports ILA's position. The January Agreement contains no language providing for the abrogation of the enumerated agreements should a carrier fail to subscribe to the January Agreement. Yet, in prior agreements, the parties included explicit language when they intended to abrogate earlier agreements. For example, the September Agreement provides that it is "a substitute for the Master Agreement of April 16, 1983, which is hereby revoked."

Delta's arguments to the contrary are not persuasive. Delta's counsel maintains that "[s]ince Delta has concededly refused to execute the January 25 Agreement, it has not, in the words of the January 25 Agreement itself, 'subscrib[ed] to [or] become part[y] to any existing agreement with ILA.'" Delta's Memorandum of Law dated April 24, 1984, at 18. Similarly, in its Reply Memorandum dated May 24, 1984, at 9, Delta characterizes the following as its "essential argument":

> the January 25 Agreement struck between management associations and ILA expressly gave the "Steamship Carriers" —not any association or representative— the option of refusing to subscribe to that agreement and whatever it specifically incorporated (i.e., the September 26 Common Terms).

However, Delta has failed to buttress these claims with any evidence. Peter J. Secaras, the Division Director of Terminal Operations for Delta, indicated that he, as a Delta representative, observed some of the negotiations concerning the January Agreement. Secaras recounts various conversations in which NYSA's counsel stated that Delta would only be bound to the January Agreement if Delta signed it. However, neither Secaras nor any other Delta employee presents any evidence supporting Delta's position that its decision not to sign the January Agreement resulted in the legitimate termination of the enumerated agreements. In sum, there is no material issue of fact existing with respect to this claim; Delta's failure to sign the January Agreement did not abrogate the enumerated agreements.

 Additionally, Delta is bound to the September Agreement. Although the parties dispute when the September Agreement became effective, the resolution of this controversy is unnecessary. As stated earlier, once negotiations have commenced, a member's attempt to withdraw from a multiemployer bargaining unit is untimely, absent special circumstances or consent by the union, neither of which Delta alleges. Even assuming that Delta correctly states that the September Agreement became effective in February, 1984, Delta is bound to the September Agreement since the negotiations had begun in March, 1983.[13] Accordingly, Delta is bound to the September Agreement.

In sum, Delta's failure to subscribe to the January Agreement did not abrogate the individual contracts enumerated in that Agreement. Additionally, Delta is bound to the September Agreement. With these issues resolved, the Court turns to the pending motions.

### MOTION TO CONFIRM

ILA moves to confirm the arbitration award, which was rendered pursuant to the Containerization Agreement. The Containerization Agreement is made applicable to Delta pursuant to paragraph 6 of the September Agreement (see footnote 1,

---

**13.** Accordingly, Delta's request for additional discovery on the issue of when the September Agreement became effective is moot. Similarly,

ILA's claim that Delta's membership in NOSA and WGMA binds Delta to the September Agreement need not be addressed.

*supra* ).[14] Paragraph 4 of the July 29, 1983 Amended Containerization Agreement provides:

> The Master Agreement to become effective October 1, 1983 shall include all provisions of the Containerization Agreement and rules on containers, as well as other agreements together with amendments and including this procedural understanding.

There can be no question that the Containerization Agreement, which is part of the September Agreement, requires Delta to arbitrate ILA's claims. ILA's claim that Delta improperly used non-ILA labor goes to the core of the Containerization Agreement.[15]

■ It is well-settled that judicial review of an arbitration award is very limited. *Diapulse Corp. of America v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir.1980). As a general rule, an arbitrator's decision will not be set aside on direct review even where the arbitrator has misinterpreted the facts or the law. *International Union of Elev. v. National Elev. Ind.*, 772 F.2d 10, 12 (2d Cir.1985). Only where there is manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may reviewing courts disturb the award. *Livingston v. Nestle-LeMur Co.*, 607 F.Supp. 1337, 1340 (S.D.N.Y.1985) (citation omitted).

■ The Court may vacate or modify an arbitrator's award only if one of the grounds specified in 9 U.S.C. §§ 10 and 11 exists.[16] *Diapulse Corp. of America*, 626 F.2d at 1110. Thus, the Court addresses only Delta's objections which fall within sections 10 and 11.[17]

■ Delta's initial contention that the Arbitration Act is inapplicable to the instant action is rejected. *See Hellman v. Program Printing, Inc.*, 400 F.Supp. 915, 917 (S.D.N.Y.1975) ("Further, even though this is a § 301 action the Arbitration Act is clearly applicable."). *See also Intern. Longshoremen's v. West Gulf Mar. A.*, 605 F.Supp. 723 (S.D.N.Y.1985) (motion to vacate award issued by Emergency Hearing Panel brought pursuant to the Arbitration Act); *Intern. Longshoremen's Ass'n v. Hellenic Lines*, 549 F.Supp. 435, 438 (S.D.N.Y.1982) (In action brought pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and 9 U.S.C. § 1 *et seq.*, jurisdiction existed under the Federal Arbitration Act "because the collective bargaining agreement plainly evidences an intent to submit controversies to arbitration if necessary, rather than to resort to a judicial forum").

■ Delta's second affirmative defense, that the Panel was biased and committed prejudicial misconduct, is also rejected.

---

**14.** ILA eventually concedes that it "mistakenly invoked" the January Agreement in the instant motions. Affidavit of Thomas W. Gleason, Sworn to on June 9, 1984, at 12.

**15.** The Panel advised Delta of the hearing in a letter, which stated:

> This will advise that the Executive Committee of the MANAGEMENT–ILA EMERGENCY HEARING PANEL will sit on Wednesday, April 11th, 1984 at 2:30 P.M. to hear the complaint and grievance of [ILA] that [Delta] is in violation of the terms of the Management-ILA Agreement of January 25, 1984 and more particularly the Containerization Agreement...

Thus, while ILA may have improperly relied on the January Agreement, Delta was aware that ILA's demand for arbitration was based on the Containerization Agreement.

**16.** Section 10 severely restricts the power of a Court to vacate an award to cases involving fraud in procurement of the award, misconduct, or arbitrators clearly exceeding their powers. Section 11 grants Courts more flexibility when a party seeks to modify or correct an award. That section authorizes judicial intervention where there is an evident miscalculation of the figures, an award was made on a matter not submitted to the arbitrators, or the award is impermissible in form.

**17.** Delta's affirmative defenses not falling within sections 10 and 11 of the Arbitration Act will not be addressed. Most of these defenses were initially directed at the January Agreement. To the extent that these claims apply to the September Agreement, Delta arguably waived these defenses by renewing the master contract and complying with the containerization provisions. *See Teamsters, Local 533 v. Herbert Fuel Oil & Trucking Co.*, 543 F.Supp. 831, 835–36 (E.D.N.Y. 1982).

Delta has not even come close to meeting the standard for vacating arbitration awards on the ground that the arbitrators were partial. *See, e.g., Teamsters, Chauffeurs v. E.D. Clapp Corp.*, 551 F.Supp. 570, 577 (N.D.N.Y.1982) ("... an award will not be vacated on the grounds of evident partiality of the arbitrator unless the conduct of the arbitrator was so biased and prejudiced as to destroy fundamental fairness."), *aff'd*, 742 F.2d 1441 (2d Cir.1983). Delta claims that the composition of the Executive Committee and the Panel favors ILA. It is far too late in the day to raise such an objection. Delta has been aware of (and agreed to) the composition of the Panel in earlier collective bargaining agreements. *Cf. United Steelworkers of America v. Union R. Co.*, 648 F.2d 905, 913 (3d Cir.1981) ("[w]hen the reasons supporting an objection are known beforehand, a party may not wait to make an objection to the qualifications of [an arbitrator] until after an unfavorable award has been made.").

■■■■ While the awards issued by the Panel may have been disproportionate to the alleged injuries sustained, they were issued pursuant to a liquidated damages clause to which Delta had agreed. Such clauses have been part of these collective bargaining agreements since 1969. *See N.L.R.B. v. International Longshoremen's Ass'n.*, 447 U.S. 490, 499, 100 S.Ct. 2305, 2311, 65 L.Ed.2d 289 (1980). Moreover, Delta's allegation that the Panel committed prejudicial misconduct by holding a hearing while ILA's petition to compel arbitration was pending is meritless. Absent an order from this Court staying those proceedings, the arbitrators were permitted to conduct the hearing. *See Corallo v. Merrick Cent. Carburetor, Inc.*, 733 F.2d 248, 251 n. 1 (2d Cir.1984) (where the objecting party is not required to participate in the selection of the arbitrator, the arbitrator, otherwise properly designated, may proceed in the objecting party's absence); *International Longshoremen's Association, AFL-CIO and New York Shipping Association, Inc. v. Trikora Lloyd*, No. 84 Civ. 0210 slip op. (S.D.N.Y. May 9, 1984) [Available on WESTLAW, DCTU database]

(Arbitration award confirmed even though carrier refused to appear at hearing).

For some reason, unknown to this Court, Delta waited until November, 1984 before moving to stay further arbitration proceedings. By that time, numerous additional awards had been issued. *(See* footnote 6, *supra)*. On November 19, 1984, the parties resolved this matter by entering into a stipulation and order. *Id. Cf. Comprehensive Accounting Corp. v. Rudell*, 760 F.2d 138, 140 (7th Cir.1985) (party challenging agreement to arbitrate should move to enjoin the arbitration).

■■■■ Delta opted not to participate in the arbitration proceedings and is now dissatisfied with the arbitrator's conclusion. However, Delta's claims are outside the scope of this Court's review once it is determined that the award was rendered within the confines of the parties' agreement. In short, the arbitrator's decision must stand undisturbed by this Court. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960).

## MOTION TO COMPEL ARBITRATION

■■■■ An order to arbitrate a grievance should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Intern. U., United Auto., Aero. & Agr. v. Gen. Elec.*, 714 F.2d 830, 832 (8th Cir.1983), *quoting, United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *Gallo Wine*, 511 F.Supp. at 789.

ILA moves to compel arbitration pursuant to the Work Incentive Agreement. Unlike the Containerization Agreement, the Work Incentive Agreement is not mentioned in the September Agreement. However, ILA has shown that it is the custom and practice of management and labor to carry over expiring master contracts unless they are specifically changed in the new Master Agreement. ILA has submitted

the sworn affidavit of the President of NYSA, who states:

It is also our practice when drafting a new three-year contract to carry forward the prior collective bargaining agreement in its entirety, except for specific changes in the new agreement. The agreement that is carried forward is the contract that exists at the end of the term (usually September 30th), with all the modifications and amendments that have been made during the previous three years.

Affidavit of James J. Dickman, Sworn to on November [15], 1984, at 2.

■ Additionally, the President of ILA states that once the September Agreement went into effect, the Work Incentive Agreement, as well as eight other existing agreements "were also carried forward as part of the 1983–86 contract." Affidavit of Thomas W. Gleason, Sworn to on May 9, 1984, at 22. Since Delta has failed to submit any evidence rebutting these contentions, the Court finds that the Work Incentive Agreement is part of the September Agreement.

The Court now turns to ILA's claim that the Work Incentive Agreement requires Delta to submit to arbitration. Title 9 U.S.C. § 4 provides that with respect to a motion to compel arbitration

The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

Under section 4, it must be established that: (1) an arbitration agreement exists; (2) the dispute falls within the scope of the arbitration agreement (*i.e.,* "under a written agreement for arbitration"); and (3) the dispute does not involve the making of the agreement or the failure to comply therewith. *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 63 (2d Cir.1983). *See also McCallister Bros.,* 621 F.2d at 522 (In considering a motion to compel arbitration, a district court must make a threshold inquiry into whether the contract's arbitration provisions arguably cover the dispute at hand.).

ILA has not shown that its claim that Delta is obligated to sign the January Agreement falls within the scope of any arbitration clause. ILA merely cites to the Work Incentive Agreement and local agreements, without showing how these agreements cover the dispute at hand. ILA concedes as much when it states

it is conceivable that the [c]ourt might find that, even though there was still a contract between the parties, the issue of whether Delta is required to physically subscribe to the January [A]greement is not one that the Master Agreement or any local agreement requires to be arbitrated. But there is no doubt whatsoever that violations of the container rules are arbitrable matters.

Affidavit of Thomas W. Gleason, Sworn to on June 7, 1984, at 16.

■ In its motion to confirm the arbitration award, ILA showed that the arbitration clause in the Containerization Agreement applied to that dispute. ILA claimed that Delta improperly used non-ILA labor in direct violation of the Containerization Agreement. However, no such showing was made in ILA's motion to compel arbitration. ILA relies on a different agreement, the Work Incentive Agreement, which, on its face, does not appear to require Delta to arbitrate ILA's claim that Delta must sign the January Agreement. At this stage of the proceedings, a material issue of fact remains regarding whether an arbitration clause exists that requires Delta to arbitrate ILA's claim that Delta must sign the January Agreement.

■ Under 9 U.S.C. § 4, "[i]f the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." Although the statute provides for challenges to the "making" of the agreement to arbitrate, the term encompasses any challenge to the

validity of the agreement, even if there is no disagreement that it was "made." *Matterhorn Inc. v. NCR Corp.*, 763 F.2d 866, 868 (7th Cir.1985). Accordingly, a trial on this issue will be scheduled shortly.

In conclusion, ILA's motion to confirm the arbitration award is GRANTED. ILA's summary judgment motion regarding its petition to compel arbitration is DENIED. Delta's motions for summary judgment are DENIED.

SO ORDERED.