**In the Matter of the Arbitration between INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Petitioner–Appellee,**

v.

**DELTA STEAMSHIP LINES, INC., Respondent–Appellant.**

**No. 1158, Docket 87–7184.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1986.

Decided Nov. 4, 1987.

Stephen E. Tallent, Washington, D.C. (Gibson, Dunn & Crutcher, Jonathan L. Sulds and Paul D. Inman, Washington, D.C., of counsel), for respondent-appellant.

Ernest L. Mathews, Jr., New York City (Thomas W. Gleason, Kevin Marrinan and Maura R. Cahill, New York City, of counsel), for petitioner-appellee.

Before Van Graafeiland, Meskill and Cardamone, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge.

The issue on this appeal from an order of the United States District Court for the Southern District of New York (Kram, J.) is whether the posture of the case before the district court was such that it warranted disposition by summary judgment. After reviewing an unsatisfactory twelve hundred page appendix spattered with mutually contradictory and conclusory affidavits, we conclude that it did not. Unlike the district court, we are not prepared to accept the affidavits submitted by the petitioner-appellee as statements of unassailed and unassailable fact, particularly when they deal with such matters as intentions, understandings, contemplations, ideas, thoughts and motivations, 636 F.Supp. 722, 732–33. *See Friedman v. Meyers*, 482 F.2d 435, 438–39 (2d Cir.1973). Without purporting to decide the case on the merits, we hold that inconsistent and contradictory factual allegations in the record, some of which we will discuss, create genuine issues which preclude summary disposition.

The three principals in the events leading to this litigation, which ultimately will entail awards of over $13 million, 636 F.Supp. at 728 n. 6, are New York Shipping Association, Inc. (NYSA), Delta Steamship Lines, Inc. (Delta) and International Longshoremen's Association (ILA).

The NYSA was organized in 1955 under the New York Membership Corporation Law "[t]o function as an association of contracting stevedores, owners and/or operators of ocean-going vessels in the transportation of passengers and freight for hire for the purpose of promoting the labor relations of the shipping industry in the Port of New York and to promote the mutual welfare of [its] members ... in connection with labor relations matters with their waterfront employees...." Its voting members consist of independent contracting stevedores, known as "direct employer member[s]", and owners or charterers of ships calling at the Port of Greater New York and Vicinity, who are known as "carrier member[s]".

The Association's president is authorized to negotiate collective bargaining agreements on behalf of its members in accordance with policies and objectives set by the Board of Directors, but all agreements so negotiated are subject to approval by the Board. The Association's by-laws provide moreover:

If any such agreement so negotiated and approved by the Board is accepted by a majority of the voting members attending, in person or by proxy, at a meeting called for the purpose, all voting members and associate members shall be bound thereby and become parties thereto, except in the case of any voting member or associate member who or which shall within fourteen (14) days after such ratification indicate, in writing, addressed to the Secretary, its refusal to subscribe to said agreement, in which case such voting member or associate

member shall be considered to have withdrawn from the Association pursuant and subject to the requirements of Article I, Section 6 hereof.

Delta, a onetime carrier member of NYSA, was a relatively small shipping company which ceased operations in 1985. The record does not disclose what role, if any, the $13 million in awards played in Delta's demise, except that the total awards apparently represented more than a quarter of Delta's 1984 net worth. Delta avers that it always hired independent contractors to supply it with marine terminal services, including the loading and unloading of its ships. The independent contractors hired the labor to render the services and supervised the laborers. The stevedores based their charges to Delta on their labor and supervision costs, equipment usage, terminal rental, overhead and profit. There was no common ownership or control between Delta and any of its independent contractors.

The ILA is the dominant East Coast union for longshoremen and other waterfront employees, with locals in thirty-six East Coast and Gulf Coast ports. Its president during the period of this controversy was Thomas Gleason. Since 1956, the ILA has been attempting to organize a single bargaining unit for this entire coastal area. It has not succeeded. The most it has been able to achieve is a consensual agreement among seven regional management associations, including the NYSA, to bargain on certain items, which form a "Master Agreement" that is submitted to local port associations for ratification. As six of the seven contracting parties described their relationship, "[t]here is a master contract but no master management organization."

In April 1983, negotiations were completed for a three-year Master Agreement to become effective on October 1, 1983. James Dickman, the president of the NYSA, signed the resultant Agreement. On September 26, 1983, a revised Master Agreement was executed. This was described as an interim agreement necessitated by then pending litigation over the legality of the Rules on Containers. The April agreement was revoked, and local union ratification balloting scheduled for September 28 was cancelled. In a letter to NYSA members dated September 27, 1983, Mr. Dickman described the September agreement as a "revised Master Agreement which is subject to ratification after agreement is reached on local conditions." The September agreement was "extended" to January 15, 1984, and then to February 8, 1984, in order to permit local port negotiations to be completed.

However, on January 25, 1984, a third agreement was prepared at a meeting held in Miami, Florida. A Delta representative, who attended portions of that meeting as an observer, states that he was informed by NYSA counsel that Delta would not be bound by the proposed contract unless Delta signed it. On February 6, 1984, Delta notified the NYSA and the ILA that it would not sign the January 25 agreement and that the NYSA could not sign on its behalf. This automatically terminated Delta's NYSA membership.

So far as we have been able to determine from the unsatisfactory record, the September agreement, as such, was never ratified by all locals. The ILA alleged in its pleadings below that the January 1984 agreement was the "Master Agreement" which was "in full force and effect." Although the ILA thereafter reversed its position and argued that the January 1984 agreement was simply "collateral" and "redundant", and that the September 1983 agreement was the one in force, this creates at most a question of fact. As late as December 1983, Mr. Gleason was quoted as saying he did not consider that the ILA had an enforceable Master Agreement.

Because Delta was unable to hire stevedores affiliated with the ILA after it refused to become a party to the January 1984 agreement, it secured the services of stevedores affiliated with other unions in Houston, Jacksonville and Philadelphia. The ILA then filed grievances with an Emergency Hearing Panel provided for in a 1981 agreement and "incorporated by reference into the [January 1984] Master Agreement." The ILA sued in the district

court to compel Delta to arbitrate before that panel as allegedly required by the January 1984 "Master Agreement." The motion to compel arbitration never was decided. Despite Delta's refusal to participate in the hearings before the Emergency Hearing Panel, the Panel proceeded to make the above described awards. This appeal was taken from the district court's order affirming one of those awards.

■ As is apparent from the foregoing brief factual recital, there are numerous issues in this case that do not lend themselves to summary disposition. Indeed, in opposing a motion by Delta for summary judgment in Delta's favor, the ILA listed eleven "statement[s] of material facts as to which there exists a genuine issue to be tried." A list similar in many respects subsequently was filed by Delta. Perhaps the principal triable issue incorporated in both lists was the extent of NYSA's authority to bind Delta to labor agreements covering ports such as Houston, Jacksonville and Philadelphia. The NYSA was organized for the purpose of promoting labor relations in the Port of New York, the NLRB certified bargaining unit. The authority of its president to negotiate collective bargaining agreements is limited, his proposals being subject to approval by the Board and acceptance by a majority of the Association's voting members. Even such majority vote is not binding on any member which disavows the ratification and the president's proposed agreement. ILA President Gleason's statement that he was not aware of these by-law provisions creates only a triable issue of fact.

Insofar as the Port of New York was concerned, the NYSA purported to act on behalf of both the independent stevedores and the shipowners. So long as both were content to deal jointly with the ILA, the NYSA was not presented with a conflict of interest in representing both classes of members in its Port of New York negotiations. However, the record does not disclose that there was a community of interests between member-carriers such as Delta and non-member stevedores in areas other than New York.

In a June 1984 memorandum executed on behalf of all the regional associations except the NYSA, the central objective of the six regional associations and their constituent port associations was said to be the negotiation of labor agreements that would result in competitive labor costs. The memorandum points out that port associations had attempted to accomplish this objective and "this has resulted in practices and labor costs which differ port by port." The NYSA, on the other hand, wanted to impose its own high labor costs on all ports so as to reduce competition from those ports. This, the memorandum said, "is unfair to the Carriers which must pay the bills; to the stevedores, terminal operators and Port Associations which strive for competitive port costs and to the shippers, consumers and general public who ultimately must pay for higher and unwarranted transportation costs."

Delta was one of the carriers that called at ports in areas other than New York and "[had to] pay the bills." We believe there is a serious question whether the NYSA had the authority to impose this burden on Delta. Moreover, unlike the situation that existed in the Port of New York, the NYSA had no relationship with the independent stevedoring companies that operated in ports as far away as the Gulf Coast, and the NYSA could not be said to be representing them in its efforts to increase their costs of operation.

■ In its statement of material facts containing genuine issues for trial, the ILA also included questions as to whether the Master Agreement covered a bargaining unit structure broader than what was certified by the NLRB and whether Delta could reject representation by this unit after negotiations had commenced. In view of (1) the statement by ILA President Gleason, as quoted in the shipping trade's Journal of Commerce, that he was unsuccessful in convincing management from just the East Gulf ports to bargain as a unit, (2) the statement by six management associations that there is "no master management organization", (3) the apparent need for port association and NYSA membership rat-

ification of a proposed Master Agreement, and (4) Delta's right to disavow representation by the NYSA on its behalf, we hold that these questions were not answered by the district court's selective references to conflicting affidavits. The test of whether an employer has delegated authority to a multiemployer unit to negotiate a collateral bargaining agreement on its behalf is "whether the employer has indicated from the outset an unequivocal intention to be bound by group action and whether the union has been notified of the existence of the group and the delegation of bargaining authority to it and has assented to and entered upon negotiations with the group's representative." *Crane Sheet Metal, Inc. v. NLRB*, 675 F.2d 256, 259 (10th Cir.1982). "Absent such an unequivocal commitment to be bound by group action, an employer is free to withdraw from group negotiation at any time, or simply to reject the terms of the final group contract." *Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404, 420, 102 S.Ct. 720, 729, 70 L.Ed.2d 656 (1982) (Stevens, J., concurring). Moreover, as the six regional associations pointed out in the above described 1984 memorandum, despite the so-called Master Agreement, there were divergent practices among the ports involving gang foreman, crane operators, container maintenance and repair, and "deep sea ILA jurisdiction". "Uniformity," the memorandum says, "seems to mean whatever Mr. Gleason wants it to mean at any given time."

The memorandum states further that the Charleston Agreement covering container maintenance and repair for the South Atlantic ports was negotiated by New York representatives and the Carriers Container Council, which was not a recognized bargaining agent, without any representation by other management associations and without any consultation with them. Had Delta signed the January 1984 contract, it would have bound itself to that agreement. 636 F.Supp. at 726–27 n. 3. To say the

least, a serious question exists as to whether the seven regional associations and Delta, as a conditionally represented employer, "marched as latter-day musketeers bound by irretrievable pledges of solidarity." *Retail Clerks Union, No. 1550 v. NLRB*, 330 F.2d 210, 214 (D.C.Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 59, 13 L.Ed.2d 39 (1964).[1]

■ One of ILA's other "statement[s] of material facts as to which there exists a genuine issue to be tried" involved whether Delta was the joint employer of longshoremen hired by stevedoring firms to unload Delta's vessels. Whether Delta exercised sufficient supervision and control over its independent stevedores' employees to qualify as a joint employer "is essentially a factual issue." *Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 136 (2d Cir.1985) (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898–99, 11 L.Ed.2d 849 (1964)), *cert. denied*, —— U.S. ——, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986). In determining whether Clinton's Ditch Cooperative exercised such control, we looked at who hired and fired, who supervised and disciplined, who paid wages and employees' benefits, who kept the employment records and who bargained collectively with the employees involved. *Id.* at 138–39. There is no good reason why a similar factual test should not be applied to carriers such as Delta which contracted with independent stevedores. *See International Longshoremen's Ass'n v. NLRB*, 613 F.2d 890, 912–13 (D.C.Cir. 1979), *aff'd*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980). The district court made no mention of this test and apparently disregarded Delta's affidavits which indicated a complete absence of supervision and control. Instead, in an unreported opinion denying Delta's motion for reconsideration, the district court almost cursorily made a generalized factual statement that "[a]lthough a stevedore is introduced

1. We do not believe that the Supreme Court's references to a multiemployer bargaining association or group in *NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 496 n. 10, 100 S.Ct. 2305, 2309 n. 10, 65 L.Ed.2d 289 (1980) (first appeal) and 473 U.S. 61, 65 n. 2, 105 S.Ct. 3045, 3048 n. 2, 89 L.Ed.2d 47 (1985) (second appeal), which dealt with different contracts and different issues, predetermine whether Delta was irretrievably bound by the terms of the January 1984 Master Agreement, which issue is presented now for the first time.

into the relationship between carrier and longshoremen, the work is still performed by the same person who would have done the work if the carrier elected to employ directly—it is not performed by another unit of employees employed by a separate and distinct employer." Without referring specifically to Delta, the district court continued, "Carriers, in addition, contribute directly to the longshoremen's fringe benefit funds, and through the Container Royalty, pay part of their compensation." (Delta submitted sworn statements that this was not true as to it). After these two brief comments, the district court concluded that "the carriers [presumably including Delta], and not the stevedoring companies, are the ILA's members' primary employers...." Once again, the district court shortcutted the proper procedures for resolving disputed questions of fact.

Delta asserted that the contract under which the ILA purported to "arbitrate" its grievances was illegal. *See Perma-Line Corp. v. Sign Pictorial and Display Union*, 639 F.2d 890, 894–95 (2d Cir.1981); *Danielson v. International Organization of Masters, Mates and Pilots*, 521 F.2d 747, 754–55 (2d Cir.1975). It alleged violations of section 8 of the Labor Management Relations Act, "also known as the National Labor Relations Act", 29 U.S.C. § 158, and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. We believe it inappropriate for either the district court or this Court to address the merits of these legal claims until there has been proper resolution of disputed material factual issues. We reverse and remand to the district court so that this may be done in a manner consistent with our opinion.